790 A.2d 773

Kathleen SCHROEDER,

v.

Roland BROADFOOT, Jr.

No. 480, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Feb. 5, 2002.

Samantha Z. Smith (Hickman, Ulsch, McFaul & Smith, P.A., on the brief), Westminster, for appellant.

Martha Ann Sitterding, Westminster, for appellee.

Argued before DAVIS, DEBORAH S. EYLER and KRAUSER, JJ.

DEBORAH S. EYLER, Judge.

In a paternity and custody case between Kathleen Schroeder ("Kathleen"), the appellant, and Roland Broadfoot, Jr. ("Roland"), the appellee, the Circuit Court for Carroll County passed an order directing that the surname of the parties' child be Broadfoot. Kathleen appealed the order, contending the circuit court's ruling was an abuse of discretion. We agree with her, and shall vacate the order and remand the case for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

The child at the center of this dispute was born on July 6, 1998, to parents who were not married and were in a relationship that had become strained and unstable well before he was born. At birth, Kathleen named the child Robert John Schroeder ("Robert").

On July 10, 1998, Roland filed a Complaint for Blood Testing and Other Relief against Kathleen, in the Circuit Court for Carroll County. He did not acknowledge paternity of Robert, but admitted to the "possibility" of the same.

Seven days later, Kathleen filed a Complaint to Establish Paternity, Custody, and Child Support against Roland, in the Circuit Court for Baltimore County, alleging that Roland is Robert's father. Soon thereafter, blood testing was performed, upon agreement of the parties, and on August 28, 1998, the test results established Roland's paternity.

Several months later, Roland amended his complaint to seek custody and a change in Robert's surname, from Schroeder to Broadfoot.

Ultimately, the Circuit Court for Baltimore County transferred Kathleen's case against Roland to the Circuit Court for Carroll County, and all of the claims were consolidated in that court. After a period of discovery, the parties resolved their disputes by agreement, except the dispute over Robert's last

name. On March 22, 2001, when Robert was 2½ years old, the circuit court held a hearing on that issue. In addition to the facts we have recited so far, the following evidence was adduced.

Kathleen was 39 years old when the hearing took place. Sixteen years earlier, when she was 23, she had married a man named Brent Schroeder, and had assumed Schroeder as her last name. (Kathleen's maiden name is Traynor.) During that marriage, Kathleen gave birth to three children, all of whom bear the surname Schroeder. The Schroeders were divorced in 1995, and Kathleen was granted custody of the children. Kathleen chose to keep the surname Schroeder, and has used that name ever since.

In 1997, Kathleen became involved in a relationship with Roland, and soon became pregnant. The relationship was fraught with problems. According to Roland, during the pregnancy, he and Kathleen discussed the last name the child would be given and agreed upon the surname Broadfoot. According to Kathleen, no such discussion took place. To the contrary, she made it clear to Roland that she intended to give the child the surname Schroeder. When Robert was born, Kathleen did not state the name of his father on the birth certificate.[1] Roland testified that he did not know that Kath-

---

1. Roland made that fact known during his testimony, and introduced into evidence Robert's birth certificate, which designates the child's father as "not stated." His testimony suggested that Kathleen's actions were improper. Under Md.Code (1998 Supp.), § 4–208(a)(6) of the Health General Article ("HG"), however, the name of the father may not be entered on the child's birth certificate unless an affidavit of paternity, as authorized by Md.Code (1998 Supp.) § 5–1028 of the Family Law Article ("FL"), has been signed by the mother and by the person to be designated the father on the birth certificate. Moreover, under HG § 4–208(a)(8), "[i]f the father is not named on the certificate of birth, no other information about the father shall be entered on the certificate."

HG § 4–208(a)(4)(i) provides that when an unmarried woman gives birth in an institution (which would include a hospital, *see* HG § 4–201(i)), the administrative head of the institution should provide the mother and father an opportunity to sign an affidavit of paternity (or parentage). Roland testified that he saw Robert in the hospital the day he was born. There was no evidence, however, that Roland signed an

leen had given Robert the surname Schroeder until Robert was several weeks old.

Since birth, Robert has lived with Kathleen and his three half-siblings, with whom he is close. The half-siblings spend on average two weekends a month with their father, at his house. When Kathleen transports them to their father's house for this "exchange," Robert accompanies her. According to Kathleen, Robert understands that his half-siblings go to their father's house to spend time with him and understands that his father and their father are two different men. Robert's half-siblings understand this too. They also know that Kathleen has a maiden name, but does not use it as her last name.

Robert calls Roland "Daddy" and recognizes him as his father. According to Roland, Robert knows that he is his father, and is not confused about that fact.

Kathleen testified that Robert knows all three of his names, and when asked his name will say, "Robert John Schroeder." Roland disagreed, testifying that Robert knows his first and middle names, but not his last name.

Starting soon after Robert's birth, and until January 1999, Roland had visitation with Robert several times a month. The visits took place at Roland's mother's house, where he lives, and in the presence of his mother and sister. From January 1999, until September 16, 1999, these visits occurred every other weekend and on Tuesday evenings.

On September 16, 1999, Kathleen sought and obtained a domestic violence protective order against Roland. From then until February 2000, Roland's visits with Robert were supervised, and took place once a week. At that point, Roland began serving a prison sentence for an alcohol-related driving offense. Roland decided it would not be best for Robert to

---

affidavit of paternity then, or ever. Thus, even if Kathleen had identified Roland as Robert's father to the hospital authorities, the law prohibited them from entering his name, or other information about him, on the birth certificate.

attend visitation in prison, and therefore elected not to have visitation. The record does not reveal the length of Roland's prison term, but discloses that he was on work release.

Robert testified that he has paid child support for Robert from the time of Robert's birth. He has never been in arrears.

When asked why he wants Robert to have his last name, Roland gave five reasons. First, Robert "is [his] first son and only child," and therefore should have his name. Second, children should "carry" the names of their fathers, not their mothers. Third, as Robert grows up, it will be confusing to him to have to explain why his last name is different from Roland's last name. Fourth, Robert also will become confused over whether his mother's ex-husband (Brent Schroeder) is his father. Finally, it is "not natural" and "not the honest truth" for Robert to have the last name Schroeder. Roland explained that the last name Schroeder is "Brent Schroeder's name," not Kathleen's name, and is just "the name she uses, right now."

Kathleen testified that she wants Robert to use the last name Schroeder so he will feel secure and identify with her and his half-siblings, who constitute the family unit he lives with. She explained that she kept the name Schroeder after her divorce because she wanted her children to identify with her, and she wants the same for Robert. She is fearful that if Robert's last name is not the same as hers and his half-siblings, others may tease him or leave him out or treat him differently, in a bad way. In Kathleen's view, it should be left to Robert to decide, when he is older, whether he wants to use the last name Broadfoot, instead of Schroeder; and she will support him in whatever decision he makes. Kathleen wants Robert to continue to have a strong and positive father-son relationship with Roland, and will act in accordance with that objective.

The custody, visitation, and support agreement between the parties was put on the record and ultimately documented in a written order. It gave Kathleen legal and physical custody of

Robert with Roland having visitation on a phased-in schedule beginning with supervised visitation in April through June 2001, and increasing to unsupervised visitation, every other weekend and Tuesday nights, in July 2001, and thereafter.

After closing arguments of counsel, the court explained that it was going to hold the matter *sub curia* and issue a written ruling, but it already had concluded that the mere fact that Roland is Robert's father and thinks that children should "carry" their father's surnames was not reason to give Robert the last name Broadfoot. The court remarked, however, that it "ha[d] some concern about whether there is some confusion or would be some confusion in Robert's mind."

On April 26, 2001, the court issued a memorandum opinion and order directing that Robert's surname be "changed" from Schroeder to Broadfoot. After explaining that the decision about the proper surname for Robert was controlled by the best interests of the child standard, the court commented that, if Kathleen had elected to resume the use of her maiden name after her divorce, it "would have [had] no difficulty in finding that it would be in Robert's best interest to keep the name he had been given at birth," *i.e.*, Kathleen's maiden name. The court then stated that because Robert knows that Roland is his father, and the two have bonded in a father-son relationship, "it is likely that Robert will be confused as he gets older as to why he bears the surname of someone who is not his father."

Kathleen noted a timely appeal, presenting the question whether the trial court abused its discretion in ruling that it is in Robert's best interest to have the surname Broadfoot.

## DISCUSSION

Kathleen contends that there is no factual basis in the evidence for the court's decision that Robert's best interests will be served by giving him his father's surname and therefore the court's decision was an abuse of discretion. Specifically, she complains that because the evidence showed without contradiction that Robert is not confused about who his father

is, or why he does not use his father's last name, there was no evidentiary basis for the court's finding that unless Robert takes his father's surname he will suffer from confusion in the future. In addition, Kathleen maintains that the court's revelation that had she resumed the use of her maiden name, it would have found giving her surname to Robert to be in his best interests, and the court's comment that Robert will be confused in the future as to "why he bears the surname of someone who is not his father," show that the court evaluated the surname Schroeder as if it were not her surname, but merely the surname of her ex-husband.

Roland responds that the trial court's ruling was grounded in the evidence, and was based on a proper consideration of factors that, while stated in prior cases about the standard for changing a child's name the parents once agreed upon, and therefore somewhat different from this case, nevertheless are relevant to both situations.

■ Maryland follows the common law of names, that in the absence of a statute to the contrary, a person may take and use any name he wants, so long as his purpose is not fraudulent and the use of the name does not interfere with the rights of others. *Stuart v. Board of Supervisors*, 266 Md. 440, 446, 295 A.2d 223 (1972) (holding that because, at common law, a person may "adopt any name by which he may become known, and by which he may transact business and execute contracts and sue or be sued," a woman may retain her birth name after marriage merely by consistently and nonfraudulently using it) (citation omitted). *See also Romans v. State*, 178 Md. 588, 597, 16 A.2d 642 (1940) (holding that a person may be prosecuted under any name he has adopted or assumed). In *Hall v. Hall*, 30 Md.App. 214, 351 A.2d 917 (1976), then-Chief Judge Orth, writing for this Court, explained:

The common law recognized that an individual could change the given name, surname, or both, by which the community knew him merely by assuming a new one, with the restriction that the change could not be effected for fraudulent purposes or to interfere with the rights of others. The

common law sprang and was gradually developed out of the groundwork of custom. It was the ancient custom for the son to adopt a surname at will, regardless of that borne by his father, and the practice extended to the given name also. *Id.* at 219, 351 A.2d 917 (footnotes omitted) (citing *Smith v. United States Casualty Co.*, 197 N.Y. 420, 428, 90 N.E. 947, 950 (1910) ("The elementary writers are uniform in laying down the rule that at common law a man may change his name at will.")). The statutes and rules governing change of name "are not to be interpreted as the exclusive manner in which a name may be changed, ... but are in furtherance of and confer an official sanction upon a common law prerogative." *Klein v. Klein*, 36 Md.App. 177, 181, 373 A.2d 86 (1977).

The use of surnames originated in France,[2] was imported to England with the Norman Conquest in 1066, and became an established tradition by virtue of necessity. The sudden growth in population and a dearth of given, or "Christianx," names resulted in many people having the same name, and provoked the need for a way to distinguish among them. *Gubernat v. Deremer*, 140 N.J. 120, 127, 657 A.2d 856 (1995) (citing Richard H. Thornton, *Note, The Controversy Over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests*, 1979 Utah L.Rev. 303, 305, and G.S. Arnold, *Note, Personal Names*, 15 Yale L.J. 227, 227 (1906)); *see also Comment: In the Name of the Father: Wisconsin's Antiquated Approach to Child Name Changes in Post-Divorce and Paternity Proceedings*, 83 Marq. L.Rev. 279, 282 (1999).

Surnames were derived from a number of sources, the most common being a person's place of origin, his trade, profession, or craft, his father's last name, or his most distinctive physical characteristic or personality trait. *In re Schiffman*, 28 Cal.3d 640, 643, 169 Cal.Rptr. 918, 620 P.2d 579 (1980); 83 Marq. L.Rev. at 282–83. The Norman Conquest also introduced the

---

**2.** The word surname comes from the French word surnom, a combination of sur (above or beyond) and nom (name). *Gubernat v. Deremer*, 140 N.J. 120, 126, 657 A.2d 856 (1995).

feudal system to England; that system carried the custom of naming sons after their fathers as a convenience, so " 'the feudal lord could thus more easily identify sons of the soldiers most loyal to him.' " *Gubernat v. Deremer, supra,* 140 N.J. at 128, 657 A.2d 856 (quoting Beverly S. Seng, *Like Father, Like Child: The Rights of Parents in Their Children's Surnames,* 70 Va. L.Rev. 1303, 1324 (1984)). Nevertheless, the practice of adopting one's father's surname, known as "patronymics," did not predominate in the early days of surnames, and many people took their mothers' surnames:

> Inquiry into the naming practices of Western societies demonstrates that names ordinarily express kinship, but not necessarily paternity. Matronymics, names derived from the maternal line, have been employed in several Western cultures, including modern Spain and medieval England. In England, at least as late as the fourteenth century, both sons and daughters adopted their mother's surnames, often upon succeeding to their mothers' estates or in hopes of doing so.

Seng, *supra,* 70 Va. L.Rev. at 1321–22 (footnotes omitted).

The widespread custom of using paternal surnames eventually developed over time as a by-product of primogeniture, and the concomitant secondary status of women in law and society, which were central to the medieval property structure that emerged in the Fourteenth Century. The doctrine of primogeniture, under which the first-born male of parents had the exclusive right to inheritance, elevated the importance of sons taking their fathers' surnames to ease proof of inheritance rights. Conversely, because under the doctrine of "coverture," all marital property was vested in and controlled by the husband, with the wife being legally disabled and thus lacking the capacity to own property or enter into contracts, wives came to take the surnames of their husbands and their birth surnames lost relevance. 83 Marq. L.Rev. at 283. "Allowing the husband to determine the surname of [a married couple's] offspring was part of that system, wherein he was the sole legal representative of the marriage, its property, and its

children." *In re Schiffman, supra,* 28 Cal.3d at 643, 169 Cal.Rptr. 918, 620 P.2d 579.

The custom of giving children born out of wedlock their mother's surnames likewise derived from primogeniture and women's secondary status in the legal and social systems. An "illegitimate child" was considered a *"filius nullius,"* that is, a child of no one, who had no inheritance rights or right to support by his father. Lisa Kelly, *Divining the Deep and Inscrutable: Toward a Gender–Neutral, Child–Centered Approach to Child Name–Change Proceedings,* 99 W. Va. L.Rev. 1, 4 (1996). At common law, such a child had no name, and only could establish one by reputation. *Gubernat v. Deremer, supra,* 140 N.J. at 131, 657 A.2d 856. Eventually, the custom developed that such children took their mothers' names, to distinguish them from their fathers' "legitimate" children.

The legal, property, and societal underpinnings of the surnaming customs that arose in England and came to be a part of American society no longer exist. Inheritance laws do not recognize primogeniture, the doctrine of "coverture" and other impediments to women's legal rights were abolished by passage of the Married Women's Property Acts,[3] and, in Maryland, equality of rights under the law may not be abridged or denied because of sex, under the State Equal Rights Amendment, Md. Const. Decl. Rts. art. 46. Criminal "bastardy" and

---

**3.** The Maryland Married Women's Property Statute was passed by Act of 1898, ch. 457, sec. 5, enacted at Md.Code, art. 45, sec. 51, which provided:

Married women shall have power to engage in any business, and to contract whether engaged in business or not, and to sue upon their contracts, and also to sue for the recovery, security or protection of their property, and for torts committed against them, as fully as if they were married. Contracts may also be made with them, and they may also be sued separately under their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried, and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction.

"fornication" statutes were repealed and replaced by paternity statutes directed at protecting children's interests, and affording children born out of wedlock the same legal rights and status as all other children. *See Middleton v. Middleton,* 329 Md. 627, 620 A.2d 1363 (1993) (child born out of wedlock has the right to support); *Halsey v. Autry,* 293 Md. 53, 441 A.2d 1056 (1982) (same); Chapter 722, Acts of 1963 (repealing "Bastardy and Fornication" statutes and adding to the Code a new "Paternity Proceedings" subtitle). The naming customs that were outgrowths of the past have survived, however, as customs tend to do, and the tradition still prevails that children of married parents take their father's surname. With that historical background in place, we turn to the Maryland case law on the subject of children's surnames.

In *Lassiter–Geers v. Reichenbach,* 303 Md. 88, 492 A.2d 303 (1985), the Court of Appeals first addressed the question of what standard governs when a court is asked to resolve a dispute between parents over the initial surname for their child. The Court held that "when a father and mother of a child fail to agree at birth and continue to disagree upon the surname to be given the child, the question is one to be determined upon the basis of the best interest of the child." 303 Md. at 90, 492 A.2d 303. In that case, the parents were married, and both used the surname Reichenbach. They separated shortly before learning the wife was pregnant. Upon giving birth, the mother gave the child the surname Lassiter, which was her maiden name. The father was not consulted and did not learn for seven months that the child had not been given the last name Reichenbach.

The parents were divorced when the child was a year old, and the mother resumed the use of the name Lassiter. The father raised the issue of the child's last name in the divorce proceeding; by agreement, the issue was reserved for future determination. By the time it came up for a hearing, the mother had remarried and was using the last name Lassiter Geers, a hyphenation of her maiden name and her new husband's surname.

The trial court ruled that it was in the child's best interests to have his father's surname. The court reasoned that because the mother's maiden name, Lassiter, was not being used by either parent, the child's use of that name would prompt people to think, in error, that she was born out of wedlock, which could " 'lend[ ] itself to the child being put in an embarrassing position,' " which was not in her best interests. 303 Md. at 96, 492 A.2d 303.

▆ The Court of Appeals affirmed the trial court's ruling. It distinguished the case from a "change-of-name" case, in which the child's parents agreed upon a surname, which the child used, but one parent later sought to change it. In that situation, a name change only is warranted if it is in the child's best interests *and* the moving party shows "extreme circumstances." *West v. Wright*, 263 Md. 297, 299, 283 A.2d 401 (1971). By contrast, in *Lassiter–Geers* (and the case *sub judice*) the child's parents never agreed upon a surname for the child, and the child thus "was without a surname," regardless of what he or she was being called. 303 Md. at 93, 492 A.2d 303. The Court held that the inquiry in that situation is "what the surname for the child should be," which is to be answered by determining what surname will serve the child's best interests. 303 Md. at 95, 492 A.2d 303.

The Court in *Lassiter–Geers* concluded that the trial court properly exercised its discretion in finding it would not serve the child's best interests to have a surname that would cause people to think she was born out of wedlock, when she was not, or to put her in the awkward situation of having to explain her "legitimacy." In so concluding, the Court assumed, without deciding, that a judicial resolution of the name dispute by application of the customary preference for children to bear their father's surnames would violate the Maryland Equal Rights Amendment. 303 Md. at 94, 492 A.2d 303.

As noted, unlike in a "no initial surname" case, the standard applicable in a "change of name" case is not merely what is in the child's best interests, but whether "extreme circumstances" warrant the requested change. In "change of name"

cases, the Court of Appeals and this Court have emphasized that, in determining whether extreme circumstances exist, the two most important factors are misconduct by the parent that could make the child's continued use of that parent's surname "shameful or disgraceful," and abandonment by the parent that implies a surrender of his or her natural ties to the child. *West v. Wright, supra,* 263 Md. at 300, 283 A.2d 401 (reversing a trial court's decision to change the surname of eleven- and twelve-year-old boys from their father's surname to their remarried mother's new surname); *Lawrence v. Lawrence,* 74 Md.App. 472, 538 A.2d 779 (1988) (affirming a trial court's denial of a mother's petition to change her minor children's surname from their father's surname to a hyphenation of the mother's name and the father's surname).

In defending the circuit court's ruling, Roland suggests that just as misconduct and abandonment are the paramount factors for the court to consider in "change of name" cases, they are of most importance in "no initial surname" cases; and because the evidence in this case established that he did not engage in misconduct so serious as to have shamed or disgraced the name Broadfoot and he did not abandon Robert (and, to the contrary, has been involved in Robert's life and has supported him from the beginning), the circuit court's decision was not an abuse of discretion.

■ We agree with Kathleen that, while the court properly recognized that its decision was controlled by the best interests of the child standard, and while the court's discretion to determine what is in a child's best interests is broad, the reasons the court gave for its decision in this case reveal that its ruling was an abuse of discretion.

First, central to the court's best interests ruling was its factual finding that because Robert knows Roland is his father, and the two have formed a father-son relationship, "it is likely that [Robert] will be confused as he gets older as to why he bears the surname of someone who is not his father," *i.e.,* Brent Schroeder.

The evidence showed, and the parties agreed, that Robert is not confused over who he is or who is father is. To some extent, in cases such as these, the court must do its best to project into the future and make findings, in the nature of predictions, about the impact having a certain name will have on the child. *See Lassiter–Geers, supra,* 303 Md. 88, 492 A.2d 303. Findings concerning future impact must not be sheer, unfounded speculation, however; they must be reasonably grounded in some evidence about present circumstances.

■ Here, the uncontradicted evidence about Robert's relationship with Roland, and the court's finding about the relationship, was that Robert and Roland are bonded as father and son. That evidence only could support a reasonable inference *against* Robert's becoming confused about his identity, or his father's identity, as he grows older (particularly given that it was combined with evidence that Robert understands who Brent Schroeder is and that he is not his father). Yet, the court used the evidence of Roland and Robert's relationship to support the opposite inference, in *favor* of Robert's becoming confused, and to reach a finding the evidence would not support. A discretionary decision based on a factual finding that is not grounded in the evidence, and therefore is clearly erroneous, is an abuse of discretion. *See North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025 (1994) (observing that a ruling that is " 'clearly against the logic and effect of facts and inferences before the court' " is an abuse of discretion) (quoting *Shockley v. Williamson,* 594 N.E.2d 814, 815 (Ind.App.1992)).

Second, the court abused its discretion by running afoul of the common law rule on names in assessing Robert's best interests. The court found, in essence, that because "Schroeder" is Brent Schroeder's last name, when Robert gets older, he will wonder why he has Brent Schroeder's last name instead of Roland's last name; and his wondering may result in his becoming alienated from Roland.

The problem with this way of thinking, as Kathleen points out, is that it treated her as if she had no surname. In effect,

the court factored Kathleen's surname out of the "best interests" equation. Instead of deciding whether it would be in Robert's best interests to have his father's surname or his mother's surname, the court decided whether it would be in Robert's best interests to have his father's surname or Brent Schroeder's surname. The court confirmed that this was its thought process when it observed that it would have had no trouble finding it best for Robert to be given Kathleen's maiden name, had she resumed the use of that name upon her divorce. The court was ignoring the fact that "Schroeder" is Kathleen's surname and not merely her ex-husband's surname.

▮ We do not find persuasive Roland's argument that parental abandonment and serious misconduct disgracing a surname are the paramount factors in assessing the child's best interests in a "no initial surname" case, as they are in a "change of name" case, and that the absence of evidence that he abandoned Robert or engaged in serious misconduct therefore supports the circuit court's decision. Abandonment and serious misconduct disparaging of a name are of paramount importance in "change of name" cases because they epitomize the sort of exceedingly negative behavior by a parent that will justify changing the child's surname to a name other than that parent's surname, when the parents gave the child that parent's surname at birth. The focus in those cases, given the prevailing standard, is on profoundly bad parental behavior. That is not the focus in "no initial surname" cases, which call for a global best interests analysis. As we shall explain, when parents never have agreed upon their child's surname, there are a multitude of factors that come to bear in deciding what surname will serve the child's best interests. While those factors include abandonment and serious misconduct bringing shame to a surname, they are not primary or determinative.

▮ Notwithstanding that parental abandonment or other serious misconduct may have been factors relevant to the court's decision in this case, the absence of evidence that Robert had engaged in such conduct could not support the

circuit court's ruling. First, with respect to abandonment, the law is clear that a child's parents each owe him a duty of support and care. *See Garay v. Overholtzer,* 332 Md. 339, 631 A.2d 429 (1993) (holding that parents have common law and statutory duty to support and care for their children); FL § 5–203(b)(1) and (2). It cannot be said, therefore, that evidence that a parent has *not* abandoned his child, *i.e.,* that the parent has done what the law requires, is enough to establish that it is in the child's best interests to bear that parent's surname.

Second, reduced to its essence, Roland's argument is a mere repackaging of the custom of "patronymics" in the form of a legal presumption. Just as there was no evidence that *Roland* abandoned Robert or engaged in misconduct serious enough to disparage the name Broadfoot, there was no evidence that *Kathleen* abandoned Robert or engaged in misconduct disparaging of her name. Thus, Roland's theory is that when the evidence on these factors is the same for both parents, there should be a tie-breaking preference in favor of the child's bearing his father's surname.

To be sure, as we have noted, the custom of giving the children of married people their father's last name is still prevalent. (Also as we have noted, the opposite custom has prevailed when, as here, the parents were not married, a problem in Roland's argument he has chosen not to address). What parents *together* may decide to name their children is up to them and is not the issue here. The issue is how must a court go about deciding what surname will serve a child's best interests when the child's parents, having equal legal responsibility for and equal rights, including naming rights, respecting the child, cannot agree about the child's last name. A legal presumption that would operate to create a default circumstance in which, absent evidence of abandonment or serious misconduct by the child's father, the child's best interests are deemed to be served by giving him his father's surname, is a gender-based and gender-biased preference that not only is outdated in the law but also would violate the Maryland Equal

Rights Amendment. *Cf. Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977) (holding that parents are equally responsible for the duty of support and that under the Maryland Equal Rights Amendment, in allocating the responsibility of support, courts are not permitted to consider the sex of the parent as a factor).

Having concluded that the circuit court's ruling was based on a factual finding not supported by the evidence and on a misapplication of the law, we shall vacate the court's order and remand the case for further proceedings. We add the following discussion as guidance to the court on remand.

In *Lassiter–Geers,* the Court adopted a pure best interests standard for "no initial surname" cases, by which we mean the court decides the issue without either party bearing a burden of proof that would act as a legal tie-breaker, *i.e.,* a presumption, in the event the court finds the evidence to be in equal balance. The majority of courts in other states also apply a pure best interests standard in disputes between parents over their children's initial names. *See, e.g., Cohee v. Cohee,* 210 Neb. 855, 317 N.W.2d 381 (1982); *In re Schiffman, supra,* 28 Cal.3d 640, 169 Cal.Rptr. 918, 620 P.2d 579; *Brooks v. Willie,* 117 Misc.2d 640, 458 N.Y.S.2d 860 (Fam.Ct.1983). Some courts have adopted a mixed standard, however, that combines a best interests analysis with a presumption in favor of the name preferred by the custodial parent. The courts that have adopted such a standard premise it on the well-established principle that the child's custodial parent is presumed to act in his or her best interests in all respects, including in giving the child a name. *See, e.g., Gubernat v. Deremer, supra,* 140 N.J. 120, 657 A.2d 856.

It can be argued that when a "no initial surname" dispute arises between parents who never married, especially when paternity was not acknowledged before or at that time of birth, a mixed presumption is more suitable that a pure presumption.[4] In many of those situations, the parents will

4. FL § 5–1006(b) permits the filing of a paternity proceeding during pregnancy.

not have had a relationship conducive to acting together to select their child's name. Also, in those situations, from the time of the child's birth, and until paternity is established, the mother is the child's only parent in the eyes of the law. Indeed, as we have explained, *supra*, under HG § 4–208(a)(6), when a child of an unmarried mother is born, the name of the man the mother states is the child's father cannot be entered on the child's birth certificate unless he has signed an affidavit of paternity. This statute does not address naming of the child, but it is implicit that when a child's parents are not married, the information that must be obtained immediately after the child's birth for entry on the birth certificate, including the child's name, will, except in rare circumstances, come from the child's mother, whose maternity is established by nature.

On the other hand, adopting a mixed burden of proof favoring the custodial parent when unmarried parents cannot agree on the child's surname would draw a distinction between children of married and unmarried parents that otherwise has been discarded in the law, and would have the practical effect of incorporating a maternal preference because, maternity being established by nature, custody of an infant almost always is with his mother, except in highly unusual circumstances. When paternity is established, and the father thus is recognized in the law as having the obligations and rights, including the naming right, of parenthood, a custodial preference in naming is apt to create a maternal preference in naming. Moreover, using a mixed standard could lead to custody races to the courthouse and to parents refraining from agreeing upon custody, so as not to lose an advantage, and thus would be detrimental to the interests of the children who have the misfortune to be embroiled in these disputes.

We conclude that in resolving "no initial surname" disputes between unmarried parents, just as in resolving those disputes between parents who are or were married, either at conception or at the time of birth, a pure best interests standard applies. Because the matter is one of equity, however, the doctrine of laches applies. Thus, if a father delays in seeking a

determination of paternity, or in asserting his objection to the name the mother has selected for the child, the court may conclude that the father has acquiesced in the mother's naming of the child, and treat his challenge as a request for the child's name to be changed, to which the "extreme circumstances" standard applies.[5]

In the case at bar, the evidence presented to the court established that Kathleen took custody of Robert from birth; that paternity had not been established or acknowledged, by affidavit, when Robert was born; that Kathleen assigned Robert his name, which was entered on his birth certificate, in conformity with the law; and that Roland took prompt legal action to obtain blood testing and then, when paternity was established, to seek the court's intervention in resolving his and Kathleen's dispute over Robert's name. Accordingly, the pure best interests of the child standard, with no presumption or burden of proof, was and is controlling.

A number of cases from around the country have addressed the factors courts should consider, when relevant, in deciding what surname will serve the best interests of the child. The factors are: 1) the child's reasonable preference, if the child is of the age and maturity to express a meaningful preference; 2) the length of time the child has used any of the surnames being considered; 3) the effect that having one name or the other may have on the preservation and development of the child's mother-child and father-child relationships; 4) the identification of the child as a part of a family unit; 5) the embarrassment, difficulties, or harassment that may result from the child's use of a particular surname; 6) misconduct by one of the child's parents disparaging of that parent's surname; 7) failure of one of the child's parents to contribute to the child's support or to maintain contact with the child; and 8) the degree of community good will or respect associated with a particular surname. *See Keegan v. Gudahl,* 525 N.W.2d 695 (S.D.1994); *In re Pizziconi,* 177 Ariz. 422, 425,

---

5. We do not mean to suggest that that is the case here.

868 P.2d 1005 (1993); *In re Change of Name of Andrews,* 235 Neb. 170, 454 N.W.2d 488 (1990); *Bobo v. Jewell,* 38 Ohio St.3d 330, 528 N.E.2d 180 (1988); *Daves v. Nastos,* 105 Wash.2d 24, 711 P.2d 314 (1985); *In re Application of Saxton,* 309 N.W.2d 298 (Minn.1981), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982); *In re Schiffman, supra,* 28 Cal.3d 640, 169 Cal.Rptr. 918, 620 P.2d 579; *James v. Hopmann,* 907 P.2d 1098, 1100 (Okla.App.1995); *Barabas v. Rogers,* 868 S.W.2d 283 (Tenn.App.1993).

The circuit court in this case should consider whichever of these factors is pertinent in making its decision in this case. For the court to address some of these factors, it will be necessary for it to hold an evidentiary hearing to receive current information. After weighing the evidence, making findings, and analyzing, by application of the appropriate factors, whether it is best for Robert to have Roland's surname or Kathleen's surname, the court still may conclude that it is in Robert's best interests to be named Broadfoot. Our opinion should not be read to mean otherwise—or as expressing a view one way or the other.

**ORDER VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR CARROLL COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**