*IN RE K.L.*, No. 1302, September Term, 2020

**CHILD IN NEED OF ASSISTANCE - - MINOR CHILD - - JUVENILE COURT ORDER GRANTING DEPARTMENT OF SOCIAL SERVICES SOLE AUTHORITY TO CONSENT TO FILING OF PETITION TO CHANGE NAME AND DECLARE GENDER IDENTITY OF MINOR CINA - - BEST INTERESTS OF THE CHILD STANDARD - - CHANGE OF FIRST NAME TO CONFORM TO GENDER IDENTITY - - DECLARATION OF GENDER IDENTITY WHEN GENDER IDENTITY DIFFERS FROM SEX-ASSIGNED-AT-BIRTH - - PERTINENT FACTORS - - HARMONIZING NATURE OF EVIDENCE SUPPORTING ADMINISTRATIVE CHANGE OF SEX DESIGNATION ON BIRTH CERTIFICATE WITH NATURE OF EVIDENCE SUPPORTING JUDICIAL DECLARATION OF GENDER IDENTITY - - APPEALABILITY OF ORDER UNDER SECTION 12-203(3)(X) OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE.**

Seventeen-year-old child has been a CINA for ten years due to Mother's neglect. Child's sex-assigned-at-birth is male, but her gender identity is female. When child was thirteen, juvenile court ruled, over Mother's opposition, that Department could consent to child's receiving puberty blockers and feminizing hormones to transition physically from male to female. Mother has never accepted child's gender identity. When child was sixteen, she filed a motion to grant the Department sole authority to consent to the filing of a petition to change her first name and to have her gender identity declared to be female. Juvenile court granted the motion, over Mother's opposition. Mother appealed. Child and Department moved to dismiss the appeal as not taken from an appealable order.

*Held*: Order is appealable under CJP section 12-303(3)(x), which permits a party to appeal from an interlocutory order "[d]epriving a parent . . . of the care and custody of his child …." A parent whose child is a CINA does not lose the fundamental constitutional right to raise the child, although that right must be balanced against the State's interest in protecting the child from harm. Care and custody of the child includes right to make decisions about important aspects of the child's life. The right of a parent to consent to a legal course of action that could result in the child's name being changed and a judicial declaration of gender identity different from sex-assigned-at-birth is fundamental to raising the child. Because the order in this case deprived Mother of that right, it is appealable under CJP section 12-303(3)(x).

The standard governing the juvenile court's decision whether to expand the Department's limited guardianship as requested is the best interests of the child. The "extreme circumstances" test applied in disputes between parents over changing their child's last name when the child has been using that last name has no relevance to a case in which a child is seeking a change in first name to conform to the child's gender identity. Two jurisdictions that have addressed the question whether it was in the best interests of a

transgender child to grant a change in first name to correspond to the child's gender identity have identified relevant factors, which are different than the factors relevant to cases where parents are disputing whether a child's last name should be changed.

In 2003, in *In Re Heilig*, the Court of Appeals held that a circuit court has the power to declare that a transgender person's gender had "changed" from the gender the person was born with. (Gender identity now is understood to be immutable once formed, and usually formed at an early age). The Court harmonized the proof necessary to obtain such a declaration with the proof necessary, at that time, for the person to obtain an amended birth certificate with a new sex designation. Since then, the General Assembly has amended the law to provide that a person may obtain a new birth certificate with a change in sex designation upon proof of treatment short of surgery, such as medical treatment to achieve physical transition. The principle of *In re Heilig* dictates that treatment short of a permanent and irreversible physical transition will suffice to obtain a judicial declaration of gender identity different from sex-assigned-at-birth.

The undisputed facts before the juvenile court showed that the child likely could present satisfactory proof to a circuit court to support the petition, that the child had identified as a gender different from her sex-assigned-at-birth for many years, and that Mother was not accepting of the child's gender identity and had engaged in a long history of neglect of child. The court did not err or abuse its discretion in ruling that it was in the child's best interests to grant the Department sole authority to consent to the filing of a petition to change name and declare gender identity on child's behalf.

Circuit Court for Baltimore County
Case No.: 03-I-12-000154

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1302

September Term, 2020

_____

IN RE:  K.L.

_____

Fader, C.J.,
Kehoe,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  September 1, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant E.H. ("Mother") is the natural mother of appellee K.L., who is seventeen years old. K.L. is a transgender female. As we shall explain, K.L.'s biological sex at birth was male and her gender identity is female.[1]

When K.L. was seven years old, the Circuit Court for Baltimore County, sitting as the juvenile court, declared her to be a "child in need of assistance" ("CINA").[2] She has been a CINA ever since. In 2020, K.L., through counsel, filed a motion to expand the limited guardianship of appellee Baltimore County Department of Social Services ("Department"). The juvenile court granted the motion, as follows:

> **ORDERED**, that the limited guardianship . . . be expanded to include sole and full authority to consent, on behalf of [K.L.], to a petition filed by K.L. through her counsel to change her name and gender marker.

The order was issued on December 9, 2020 and docketed on December 16, 2020. ("December 16, 2020 Order").

In this appeal, Mother contends the juvenile court erred by granting the Department the authority to consent to the filing of a petition to change K.L.'s name and gender

---

[1] We shall refer to K.L. by her chosen pronouns.

[2] A "child in need of assistance" is "a child who requires court intervention because: (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (1974, 2020 Repl. Vol.), § 3-801(f) of the Courts & Judicial Proceedings Article ("CJP"). "CINA" is the standard acronym for "child in need of assistance." CJP § 3-801(g).

marker.[3] The Department, joined by K.L., has filed a motion to dismiss on the ground that the December 16, 2020 Order is not appealable, to which Mother has filed an opposition. The Department and K.L. assert, in the alternative, that the juvenile court's decision was not in error.

We hold that the December 16, 2020 Order deprived Mother of a substantial decision-making right respecting K.L. and therefore is an appealable order under Md. Code (1974, 2020 Repl. Vol.), section 12-303(3)(x) of the Courts & Judicial Proceedings Article ("CJP"). We further hold that the standard for deciding whether to expand the Department's limited guardianship to include authority to consent to a change in name and gender marker is the best interests of the child and that the juvenile court did not err or abuse its discretion in granting the Department that authority over K.L.

## BACKGROUND AND TERMINOLOGY RELEVANT TO TRANSGENDER STATUS

In *Grimm v. Gloucester County School Board*, 972 F. 3d 586 (4th Cir. 2020), *rehearing en banc denied*, 976 F. 3d 399 (September 20, 2020), *cert. denied*, ___U.S.___, 2021 WL 2637992 (June 28, 2021), the Fourth Circuit held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. section 1681(a), "can protect transgender students from school bathroom policies that prohibit them from affirming their gender."

---

[3] Mother's single question presented is: "Did the juvenile court err in granting [K.L.'s] motion to expand the Department's limited guardianship so the Department can consent to the child's petition to change name and gender marker?"

2

*Id*. at 593.[4]  With the aid of amici briefs and an expert witness on behalf of the plaintiff, the court set forth "a fact-based understanding of what it means to be transgender[.]" *Id*. at 594. It explained:

> Given a binary option between "Women" and "Men" most people do not have to think twice about which bathroom to use. That is because most people are cisgender, meaning that their gender identity - - or their 'deeply felt, inherent sense' of their gender - - aligns with their sex-assigned-at-birth. But there always have been people who 'consistently, persistently, and insistently' express a gender that, on a binary, we would think of as opposite to their assigned sex.
>
> Such people are transgender, and they represent approximately 0.6% of the United States adult population, or 1.4 million adults. Just like being cisgender, being transgender is natural and is not a choice.

972 F. 3d at 594 (footnotes and citations omitted) (expert reports cited primarily rely upon Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (2015), and Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012)).

As this makes clear, one's sex refers to the biological state of the person at birth, while one's gender is the gender one identifies with.  The *Grimm* court further spelled out that, "[f]or many of us, gender identity is established between the ages of three and four years old.  Thus, some transgender students enter the K-12 school system as their gender; others, like [the plaintiff], begin to live their gender when they are older." *Id*. at 596.  The

---

[4] The Fourth Circuit noted that it "join[ed] a growing consensus of courts in holding" so. *Id.*

court estimated based on the material before it that among teenagers in the United States, "approximately 0.7%" or "about 150,000 teens" identify as transgender. *Id.* [5]

In this opinion, we shall adopt the factual understandings and nomenclature cited and used by the Fourth Circuit in *Grimm*, which are based on the present state of treatment of gender-nonconforming people within the established medical, psychiatric, and psychological communities. When we use the word/phrases "sex," "biological sex," or "sex-assigned-at-birth," we mean the sex a person is assigned at the time of birth. When we use the word/phrases "gender," "gender marker," or "gender identity," we mean the gender a person perceives, understands, and experiences as a central identity in life.

## FACTS AND PROCEEDINGS

K.L. was born in July 2004, when Mother was a CINA herself and was living in foster care.[6] By 2011, Mother had given birth to four more children, one of whom was medically fragile and died when very young.

In March 2012, when K.L. was seven, the Department received complaints that Mother was neglecting her children. On June 29, 2012, the Circuit Court for Baltimore County, sitting as the juvenile court, found K.L. and her three siblings to be CINAs and granted the Department an Order of Protective Supervision ("OPS"), with the children

---

[5] The *Grimm* court further explained that not all people identify as cisgender or transgender or on a binary of male or female. Because the question in that case was limited to transgender youth, the court did not address issues having to do with nonbinary people. That is the situation in this case as well.

[6] K.L.'s father's identity is known, but he has had virtually no contact with her throughout her life.

remaining in Mother's physical custody. *See* CJP § 3-819(c)(1)(i). Six weeks later, the police were called when the children, having been left alone at night without electricity, were found attempting to cross a busy road by themselves, in a torrential downpour. The juvenile court rescinded the OPS and placed the children in foster care with a permanency plan of reunification with Mother.[7] In K.L.'s case, the Department was granted a limited guardianship, pursuant to CJP section 3-819(c)(1)(ii), "for medical, educational and out of state travel purposes, and psychological and mental health decision-making, including the administration of medication and psychotropic drugs, if appropriate, dental care, educational services, and other appropriate services."

In the nine years since then, K.L. has not been reunified with Mother and has had many foster care placements.[8] She has suffered from severe behavioral problems that brought some of those placements to an end. Many of K.L.'s placements have been at therapeutic and diagnostic facilities. Early on, she was diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder.

Beginning at a young age, K.L. perceived herself as being female, even though her sex-assigned-at-birth was male, and preferred wearing feminine clothing and accessories. According to Department reports, by March 2016, K.L. was identifying "more and more as a female" and by August 2016, she was "identifying fully as a female" and wanted to be

---

[7] Immediately before that, Mother fled to Florida with the children. The police located them in Orlando, and they were returned to Maryland.

[8] Eventually, the CINA cases of the three siblings who were placed in foster care at the same time as K.L. were closed with custody and guardianship granted to non-relatives.

5

addressed "by female pronouns." By then, Mother was living in Pennsylvania. She was preoccupied with another child she had given birth to and was having difficulty accepting K.L.'s female gender identity. K.L. had some overnight and weekend visits with Mother, but they experienced conflict and K.L. was uncertain about the prospect of reunifying with Mother, which until then had remained her permanency plan.

In very early 2017, Mother told the Department she wanted to support K.L. in her desires but still was having difficulty accepting her gender identity. In February of that year, K.L.'s permanency plan was changed to custody and guardianship with a non-relative.[9] Six months later, when K.L. was age 13 and beginning to go through puberty, she was examined by pediatric endocrinologist Elyse Pine, M.D. Dr. Pine diagnosed K.L. with gender dysphoria, which "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-V), Gender Dysphoria at 451 (5th ed. 2013).[10] Dr. Pine recommended that K.L. start taking

---

[9] Mother did not note an appeal from that order or from any order in K.L.'s CINA case up until this appeal.

[10] The DSM-IV, published in 1994, classified transgender and other gender-nonconforming people as having "gender identity disorder[,]" which was a mental disorder. In 2012, the American Psychiatric Association, which publishes the DSM, recommended eliminating gender identity disorder and instead adopting the condition "gender dysphoria," which is not a mental disorder. In 2013, the DSM-V was published, with that change. Accordingly, the general psychiatric community no longer considers gender-nonconforming people to be suffering from a mental illness.

puberty blocker medications, which K.L. wanted to do.[11] Mother refused to consent to that treatment. Through counsel, K.L. filed an emergency motion to expand the Department's limited guardianship to give it authority to consent to such medical decisions. Mother filed an opposition.

For two days in September 2017, the juvenile court held a hearing on K.L.'s motion, during which it took testimony from witnesses, including Dr. Pine, and received relevant medical literature in evidence. On October 11, 2017, the court granted K.L.'s motion and entered an order giving the Department "sole and full authority to consent, on behalf of [K.L.], to any and all medical, psychiatric and/or psychological treatment, including, but not limited to the administration of psychotropic drugs, hormones, or other drug treatment, that addresses [K.L's] condition of gender dysphoria."

In November 2017, K.L. was moved to a therapeutic placement and began to receive puberty blockers, administered by Dr. Pine. Soon after, her interactions with Mother improved and her permanency plan was changed to a concurrent plan of reunification with Mother, and custody and guardianship with a non-relative. That only lasted a year. In September 2018, an extended home visit with Mother ended early because of friction between K.L. and Mother. After that, visits were supervised for a while.

K.L. made progress in a residential treatment center in 2019. Her therapist recommended that visits with Mother remain supervised because K.L. would become verbally aggressive in response to Mother's not using her chosen first name and pronouns.

---

[11] Puberty blockers stop the development of secondary sexual characteristics while they are being taken.

By November 2019, on the recommendation of Dr. Pine, K.L. was receiving feminizing hormone treatments in addition to puberty blockers. Visits were made unsupervised. K.L. resumed some overnights with Mother but still became upset when Mother would not use her chosen pronouns. In December 2019, the juvenile court continued the permanency plan of reunification with Mother concurrent with custody and guardianship by a non-relative.

At a permanency planning hearing before a magistrate on August 3, 2020, the Department reported that K.L. was doing well and recommended changing her permanency plan to "another permanent planned living arrangement" ("APPLA").[12] Mother did not attend the hearing but her lawyer was present and said she had been unable to reach Mother by telephone or mail. By then, K.L. was 16 years old and had fully transitioned to female, except for gender confirmation surgery.[13] K.L.'s lawyer mentioned that she intended to file a petition to change name and gender marker on K.L.'s behalf. The magistrate recommended that K.L.'s permanency plan be changed to APPLA. On August 14, 2020, the juvenile court issued an order changing K.L.'s permanency plan as recommended.[14]

---

[12] APPLA means, for a child at least 16 years old, a permanency plan that "[a]ddresses the individualized needs of the child, including the child's educational plan, emotional stability, physical placement, and socialization needs" and "[i]ncludes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life[.]" CJP § 3-823(e)(1)(i)(5).

[13] In the past, such surgery commonly was referred to as "sex reassignment surgery." Other than in quoted material, we shall use the more modern term "gender confirmation surgery." *See, e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019).

[14] During a permanency planning hearing on January 4, 2021, Mother confirmed that she agreed to changing K.L.'s permanency plan to APPLA.

On September 15, 2020, K.L., through counsel, filed a motion to expand the Department's limited guardianship to include authority to consent to a change of name and gender marker. In the motion, K.L. related that with the Department's assistance, she had obtained an Identification Card from the Maryland Motor Vehicle Administration. It gave her gender as male and did not identify her by her chosen first name. K.L. asserted that she "now wishes to have a name that conforms to her physical appearance, as her name and gender marker on her identification is a clear indication that she is genetically male. This places her in danger of ridicule and violence." She further asserted that Mother had been living in Pennsylvania for five years and had attended only a few of the permanency planning hearings over the many years K.L. had been in foster care; that K.L.'s last visit with Mother had gone badly; and that, although she and Mother had had some telephone conversations, it had been a long time since she had seen Mother.

On October 30, 2020, a hearing on K.L.'s motion took place before a magistrate. Mother, who was living in Texas, participated remotely, first through her lawyer and then speaking directly. Mother stated that although she had concerns, she did not want to stand in K.L.'s way; would not "go against" K.L.; and wanted for K.L. whatever K.L. wanted. Finding that it was in K.L.'s best interest to pursue changes to her name and gender marker, the magistrate recommended granting the motion.

Notwithstanding what she had said during the magistrate's hearing, Mother filed exceptions. The court held a hearing on December 7, 2020. K.L.'s lawyer, Mother, Mother's lawyer, the Department's lawyer, and K.L.'s social worker attended. K.L. did

9

not attend.  At the outset, the lawyers representing Mother and K.L. agreed that they would proceed by argument as no facts were in dispute.

K.L.'s lawyer recounted the history of K.L.'s 2017 gender dysphoria diagnosis and the treatments she has been receiving to physically transition from male to female.  Counsel referred to Dr. Pine's testimony from the 2017 hearing, where she had opined that administering puberty blockers and hormone treatments reduced the chance of K.L. experiencing bullying, violence, and engaging in self-harm, all of which are risks for transgender youth.  Counsel asked the court to take judicial notice of that testimony and the Department's prior reports to the juvenile court addressing K.L.'s gender dysphoria and treatment for that condition.  Counsel also referenced an October 2018 study discussing how allowing transgender youth to use their chosen names, in supporting environments, helps prevent suicidal ideations, depression, and suicidal behaviors.[15]

Counsel explained that to the outside world K.L. presents as female.  K.L. does not want to change her last name (surname).  She only wants to change her official first name (given name) to a feminine name that is similar to her original given name.  K.L. does not intend to repudiate her parents, counsel asserted, but only to have a feminine first name so she will not be "outed" as transgender when she uses her identification.  Counsel argued that the standard for expanding the Department's guardianship was whether that change would be in K.L.'s best interest.

---

[15] *See* "Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior among Transgender Youth," J. Adolesc. Health, 2018 Oct. 63 (4), 503-05, National Center for Biotechnology Information, U.S. National Library of Medicine https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/.

10

The Department's lawyer supported K.L.'s motion and asked K.L.'s social worker, Norah Stephanos, LCSW, to address the court. According to Ms. Stephanos, K.L. was not present for the hearing because she was upset that Mother was opposing the motion after saying she was supportive. In addition, it is distressing for K.L. to appear at a court proceeding where she is introduced using a masculine name she no longer identifies with and is not referred to by her chosen pronouns. Ms. Stephanos explained that she and K.L. have had a long treatment relationship, and that K.L. consistently has expressed the desire to change her first name to be feminine. Recently, in applying for jobs, K.L. had to provide her official identification, thereby involuntarily revealing her transgender status. Ms. Stephanos expressed the clinical opinion that K.L.'s mental health is negatively affected by remaining in a position of having to use a masculine first name and official identification that shows a masculine first name and gender marker.

Mother's lawyer responded that it is not in K.L.'s best interest to expand the Department's limited guardianship as requested because having a feminine name and male genitals could put her at risk of harm. She added that there was no evidence that K.L. had experienced harm or violence in her current situation. In addition, she argued that the study referenced by K.L.'s attorney was not specific to K.L. and the situation was not urgent.

Mother addressed the court, complaining generally that parents are being stripped of authority over their children and stating she had been a "good mother" to her children. As she saw it, her relationship with K.L. had been fine until she decided to contest K.L.'s progression to a name and gender marker change. She argued that the timing of such a decision was bad given the mental health problems predominating during the COVID-19

11

pandemic.  In addressing the court, Mother referred to K.L. using masculine pronouns instead of K.L.'s chosen pronouns.

Mother noted a timely appeal from the December 16, 2020 Order granting K.L.'s motion.

## DISCUSSION

## I.

### PERTINENT MARYLAND LAW ON NAMES, GENDER IDENTITY AND BIOLOGICAL SEX, AND CHILDREN IN NEED OF ASSISTANCE

#### *Name Change*

There are two non-mutually exclusive ways to change one's name in Maryland. First, Maryland recognizes the common law rule that one may adopt any name so long as one uses the name consistently and not for a fraudulent purpose.  *See Hardy v. Hardy*, 269 Md. 412, 415 (1973); *Klein v. Klein*, 36 Md. App. 177, 181 (1977).[16]  This common law right is afforded both adults and children.  *Hall v. Hall*, 30 Md. App. 214, 222 (1976).

Second, one may petition for a name change through a judicial proceeding, pursuant to Rule 15-901, titled "**Action for change of name**[.]" This is what K.L. seeks to do.  The benefit of using the judicial name change process is that an order granting the petition is

---

[16] In *Smith v. United States Cas. Co.*, 90 N.E. 947, 948-49 (N.Y. 1910), the New York Court of Appeals laid out the English history of naming customs and conventions, going back to the 10th century.  Citing *Smith* with approval, we explained in *Hall v. Hall*, 30 Md. App. 214, 219 (1976) (citation and footnote omitted): "The common law sprang and was gradually developed out of the groundwork of custom.  It was the ancient custom for the son to adopt a surname at will, regardless of that borne by his father, and the practice extended to the given name also."

12

an official court record that may be used to change or obtain other official documents. To utilize Rule 15-901 for a name change, an individual must file a petition setting forth, among other things, the person's present name, the name to which the person seeks a change, the reasons for the requested change, and a certification that the name change is not being sought for illegal or fraudulent purposes. Md. Rule 15-901(c)(1)(A) – (E).

The Rule further provides that when "the person whose name is sought to be changed is a minor," the petition must provide "the names and addresses of that person's parents and any guardian or custodian[.]" Md. Rule 15-901(c)(1)(F). In addition, the minor's petition and attachments "shall be served upon that person's parents and any guardian or custodian" in accordance with Rule 2-121. Md. Rule 15-901(d). Regardless of whether the individual seeking a name change is an adult or a minor, "[a]ny person may file an objection to the petition." Md. Rule 15-901(f).

Generally, minors lack the capacity to sue under Maryland common law. *See Fox v. Wills*, 390 Md. 620, 625-26 (2006).[17] Rule 15-901 does not address who may file a petition for name change on behalf of a minor.[18] Under Rule 2-202(b), a suit by an individual under disability to sue, such as a minor, shall be brought "by a guardian or other like fiduciary

---

[17] There are exceptions. For example, under Md. Code (2019 Repl. Vol.), section 9-103 of the Family Law Article ("FL"), a minor who is at least 16 years old may independently file a petition for custody or visitation, without a guardian or next friend.

[18] Rule 15-901 derives in part from prior Rules BH70 through BH75. Rule BH70(b) provided that a petition to change name on behalf of a minor was to be filed by "a parent, a legal guardian, or a next friend." *In re Adoption/Guardianship No. 3155*, 103 Md. App. 300, 309 (1995). That language was not included in Rule 15-901.

13

or, if none, by next friend." "Guardian" means "a natural or legal guardian[,]" Rule 1-202(j), and the parents of a minor child are the child's "joint natural guardians[.]" Md. Code (2019 Repl. Vol.), § 5-203(a)(1) of the Family Law Article ("FL").[19] Relatedly, as we discuss below, a parent, guardian, or legal representative of a minor may request, on the minor's behalf, a new birth certificate with a changed sex designation. Md. Code (2019 Repl. Vol.), § 4-211(b)(2)(i)(2) of the Health-General Article ("H-G"). If the request is granted and the individual's name "has been changed at any time," the new name on the birth certificate "shall be the name that was last established and for which appropriate documentation has been submitted to the Department [of Health and Human Services]." H-G § 4-211(f)(1)(ii).

The Maryland Judiciary's form "Petition for Change of Name (Minor)" states in the caption that the minor's petition is filed "BY AND THROUGH THEIR PARENT/GUARDIAN/CUSTODIAN." *See* Judiciary Form CC-DR-062 (Rev. 03/2021). A block advisement adds: "NOTE: You must inform all parents, guardians, or custodians about your request to change a minor's name" and "[t]ry to get consent for the minor's name change from all parents, guardians, or custodians." *Id*.

Under Maryland law, a child's parents equally enjoy the right to choose their child's given name and surname. *Dorsey v. Tarpley*, 381 Md. 109, 115 (2004) (citing *Lassiter-Geers v. Reichenbach*, 303 Md. 88, 94-95 (1985)). The Maryland cases pertaining to

---

[19] There are situations in which one parent becomes the sole natural guardian of the minor child, including when the other parent "abandons the family[.]" *See* FL § 5-203(a)(2)(ii).

14

children's names all concern last names and almost all are disputes between parents: some never married and some married and divorced. *See Dorsey v. Tarpley*, 381 Md. at 111 (unmarried parents; petition by father to change name of two-and-a-half-year-old child from mother's last name to hyphenation of both parents' last names); *Lassiter-Geers v. Reichenbach*, 303 Md. at 90 (parents married but separated when child born and mother gave child her maiden name on birth certificate with no agreement with father; in divorce proceedings father petitioned for child to have his surname); *Hardy v. Hardy*, 269 Md. at 413-14 (unmarried parents; mother petitioned to change five year old's surname from father's surname to that of man she was living with); *West v. Wright*, 263 Md. 297, 298 (1971) (divorced parents; mother petitioned to change surname of 11 and 12-year-old children to that of stepfather); *Schroeder v. Broadfoot*, 142 Md. App. 569, 571-72 (2002) (unmarried parents, father not identified on birth certificate; in amended paternity petition father sought to have infant child given his surname); *Lawrence v. Lawrence*, 74 Md. App. 472, 473 (1988) (divorced parents; mother petitioned to change names of ten and eight-year-old children from father's last name to hyphenation of both parents' last names); *Hall v. Hall*, 30 Md. App. at 216 (divorced parents; father sought to enjoin mother from having ten-year-old child use stepfather's last name). As we also shall discuss below, the Court of Appeals has held that when a child's parents never agreed on the child's surname, the court decides that name using a best interest of the child standard. *Dorsey v. Tarpley*, 381 Md. at 115. However, when the parents together named the child and the child has been using that surname, there is a presumption against changing the child's surname and the

court decides whether it will be changed using a best interest and "extreme circumstances" standard. *Id.* (quotation marks and citation omitted).

Unlike the cases above, *In re Adoption/Guardianship No. 3155*, 103 Md. App. 300 (1995), addressed the procedural question of how a child's last name can be changed after his parents' rights have been terminated and the child has been placed in the guardianship of the local department of social services.[20]  There, the department petitioned the juvenile court to appoint the child's foster parents as co-guardians, and the department and the foster parents together petitioned the same court to change the child's last name to that of the foster parents.  The lawyer who had represented the child in the termination of parental rights proceeding was not given notice of the petitions.[21]  The juvenile court granted the petitions and counsel for the child appealed.  We held that the child's lawyer was entitled to notice of the petitions and had standing to pursue the appeal; that the juvenile court lacked jurisdiction to appoint foster parents as co-guardians; and that only the circuit court, not the juvenile court, had the power to change the child's name.[22]

---

[20] Guardianship of the child after termination of parental rights is governed by FL section 5-325.  "Unless a juvenile court gives legal custody to another person, a child's guardian . . . has legal custody."  FL § 5-325(b)(1).  Unless ordered otherwise by a juvenile court, and subject to review, "a child's guardian may make all decisions affecting the child's education, health, and welfare, including consenting:  . . .  [subject to certain exceptions for inpatient psychiatric treatment] to medical, psychiatric, or surgical treatment."  FL § 5-325(b)(2)(i)(5).

[21] In TPR proceedings, children are afforded legal counsel. FL § 5-307(b)(1).  Likewise, CINAs are afforded legal counsel.  CJP § 3-813(d).

[22] Although the appeal was taken by the child, through counsel, it appears to have been pursued solely to challenge the process the court employed.  The child, who was eight years old, made it known that he wanted to be adopted by his foster parents.

No Maryland appellate case has addressed a change of a minor's first name; a dispute solely between a child and the child's parent over changing the child's first name; such a dispute in the context of a transgender child; or such a dispute when the child is a CINA.

### *Gender Identity and Biological Sex*

Maryland does not have a prescribed statutory or rule-based judicial process to declare an individual's gender identity. In *In re Heilig*, 372 Md. 692 (2003), however, the Court of Appeals held that a circuit court's general equity jurisdiction affords it the power "to determine and declare that a person has changed from one gender to another." *In re Heilig*, 372 Md. at 695. In so holding, the Court took guidance from the Maryland law then in effect governing amendments to birth certificates, which it read as making clear that the circuit court is empowered to declare a change in gender. *Id.* at 714-15. What was then H-G section 4-214(b)(5) stated that "[u]pon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this State has been changed by surgical procedure and whether such individual's name has been changed," the Secretary of Health and Mental Hygiene "shall" amend the individual's birth certificate to so reflect. *Id*. at 715.

The *Heilig* Court concluded that an individual petitioning a court to declare a change in gender must "present sufficient medical evidence of both the relevant criteria for determining gender and of the fact that, applying that criteria, [the person] has completed a *permanent and irreversible change* from [one gender to another]." *Id*. at 723 (emphasis added). The petitioner in *Heilig*, an adult transgender female, had not undergone gender

17

confirmation surgery but was taking medication, including feminizing hormones, to bring about the physical change from male to female. *Id.* at 695-96. Very little evidence had been introduced in the circuit court because that court had ruled, incorrectly, that a declaration of a person's gender only could be made in a declaratory judgment action, which meant there had to be opposing parties, which there were not.[23] The Court of Appeals remanded the matter to give the petitioner an opportunity to introduce evidence of whether the hormone therapy and other treatments she was undergoing were bringing about a permanent and irreversible change from male to female.

*Heilig* was decided almost 18 years ago, and at the time the Court of Appeals observed, presciently, "This is, clearly, an evolving area." 372 Md. at 723. As the *Grimm* case illustrates, in the years since *Heilig*, the health care communities that treat the gender-nonconforming have come to understand that people develop immutable gender identities, usually from an early age, that for some people do not correlate with their biological sex,

---

[23] As the Court of Appeals put it in *Heilig*:

> [CJP § 3-409,] which governs the appropriateness of declaratory relief in a civil action not founded specifically on a contract, deed, trust, will, land patent, statute, or administrative regulation, authorizes the court to grant a declaratory judgment if it will terminate  the uncertainty or controversy giving rise to the proceeding *and* (1) an actual controversy exists between contending parties, (2) antagonistic claims are present between the parties which indicate imminent and inevitable litigation, or (3) a party asserts a legal relation, status, right or privilege that is challenged or denied by an adverse party.

372 Md. at 711. In *Heilig*, no opposition was filed to the petitioner's request for a change in gender.

18

*i.e.*, their anatomical and often genetic sex characteristics. From the standpoint of nomenclature, the phrase "change of gender" as used by the *Heilig* Court to describe what the courts have the judicial power to declare has become a misnomer. A person's developed gender identity does not change. In today's world, that judicial power is best described as the authority to state, officially, a person's gender, gender identity, or gender marker (which in this context are synonymous).

The law likewise has evolved. Twelve years after *Heilig*, the Maryland General Assembly enacted legislation, effective October 1, 2015, altering the standard of proof for changing the "sex designation" on a person's birth certificate. By Acts 2015, c. 484 § 1 and Acts 2015, c. 485, § 1, the legislature amended H-G section 4-211, which governs new birth certificates, and H-G section 4-214, the statute the *Heilig* Court had looked to, which governs amended birth certificates. As amended, H-G section 4-211(b) provides that, for an individual born in Maryland, "the Secretary [of Health and Mental Hygiene] shall make a new certificate of birth" upon "satisfactory proof" of "one of the following" relevant criteria:

> (2)(i) 1. A licensed health care practitioner who has treated or evaluated the individual has determined that the individual's sex designation should be changed because the individual has undergone treatment appropriate for the purpose of sex transition or has been diagnosed with an intersex condition[24];

---

[24] "Intersex" is "a group of conditions where there is a discrepancy between the external genitals and the internal genitals (the testes and ovaries)." Medline Plus Medical Encyclopedia, a service of the U.S. Library of Medicine, National Institutes of Health, https://medlineplus.gov/ency/article/001669.htm. *See also Zzyym v. Pompeo*, 958 F. 3d 1014, 1018 (10th Cir. 2020)(explaining that the State Department "defines an "intersex" individual as someone 'born with reproductive or sexual anatomy and/or chromosomal

(continued)

19

2.  The individual, or if the individual is a minor or disabled person under guardianship, the individual's parent, guardian, or legal representative, has made a written request for a new certificate of birth with a sex designation that differs from the sex designated on the original certificate of birth; and

3. The licensed health care practitioner has signed a statement, under penalty of perjury, that:

A. The individual has undergone surgical, hormonal, or other treatment appropriate for the individual, based on generally accepted medical standards; or

B. The individual has an intersex condition and, in the professional opinion of the licensed health care practitioner, based on generally accepted medical standards, the individual's sex designation should be changed accordingly; [**or**]

(ii)  A court of competent jurisdiction has issued an order indicating that the sex of an individual born in this State has been changed[.][25]

Subsection (f) of H-G section 4-211 goes on to provide that upon satisfactory proof, the sex designation on the new birth certificate shall be the one proven; the name on the new birth certificate shall be in accordance with any name change shown to have been made; and the new birth certificate shall not be "marked 'amended'" or reflect that there has been a change in sex designation or, if applicable, name.

---

pattern that does not fit typical definitions of male or female'")(citations omitted). The Court in *Heilig* provided a comprehensive discussion of intersex conditions.  *Id*. at 698-710.  K.L. does not have an intersex condition.

[25] A third entitlement to a new birth certificate showing a new sex designation is: "Before October 1, 2015, the Secretary, as provided under regulations adopted by the Department, amended an original certificate of birth on receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of the individual had been changed." H-G § 4-211(b)(2)(iii).  This does not apply to K.L.

20

The contemporaneous amendment to H-G section 4-214, governing amended birth certificates, repealed the language that had applied to a change in sex designation, including the requirement that an individual show proof of gender confirmation surgery in order to obtain an amended birth certificate. Current H-G section 4-214 does not concern changes to sex designations on birth certificates at all.

These amendments resulted from passage of Senate Bill 743. The *Fiscal and Policy Note* for that bill explained in "Background" the reasoning behind them:

> According to a 2014 *Reuters* article, New York recently amended its policy regarding sex-change designations for birth certificates: transgender people born in the state (with the exception of New York City, which maintains its own policy) no longer have to prove that they had a sex-reassignment surgery in order to change the sex on their birth certificates. Instead, a transgender person must only provide a notarized affidavit from a doctor treating that person for "gender dysphoria" (also known as "gender identity disorder"). According to the article, many transgender people (those who identify as having a different sex than the one at birth) do not need, want, or cannot afford sex-reassignment surgery. Additionally, transgender people who are unable to change the sex marked on their birth certificates may face discrimination or embarrassment. Four other states (Vermont, California, Oregon, and Iowa) as well as Washington, DC, also do not require proof of surgery before changing sex designations on birth certificates. As of 2010, the U.S. State Department also does not require proof of sex-reassignment surgery in order to alter the sex marked on passports and consular birth certificates.

*MD Fisc. Note*, 2015 Sess., S.B. 743 at 3 (March 10, 2015).

Accordingly, since 2015, a person born in this State who has requested a birth certificate reflecting a new sex designation is entitled to one if the person is undergoing treatment to transition from one sex to another and provides the necessary supporting information from a treating licensed health care practitioner; *or* if the person has obtained a court order indicating that "the sex of the individual . . . has changed."

21

The previous requirement for gender confirmation surgery that controlled when *Heilig* was decided no longer exists. The *Heilig* Court adopted a standard of proof for a "change" in gender (now more properly described as a declaration of gender, gender identity, or gender marker) that coordinated conceptually with the prior version of H-G section 4-214. Although it did not limit individuals seeking such a declaration by court order to those who had had surgery, as the prior statute had, it required "sufficient medical evidence . . . [the person] has completed a *permanent and irreversible change* from [male to female or vice versa]." 374 Md. at 723 (emphasis added). Thus, whether a change in sex designation was sought on a birth certificate or a declaration of gender was sought from the circuit court, the petitioner was required to prove a permanent and irreversible change.

As we see it, the principle underlying the *Heilig* Court's holding is that the proof to support a judicial declaration of a person's gender that is other than that person's sex-assigned-at-birth should harmonize with the proof to support an administrative change of the sex designation that originated on the same person's birth certificate. The permanent and irreversible standard for a declaration of gender by court order, adopted in *Heilig*, was compatible with the statutory surgery requirement for changing the sex designation on a birth certificate, as then existed. Since 2015, that standard no longer comports with the statutory standard for changing the sex designation on a birth certificate, however. The holding in *Heilig* now dictates that in a court proceeding to declare the gender of a non-intersex person, the petitioner's evidence should show that the petitioner has undergone or is undergoing appropriate treatment, whether surgical, hormonal, or other generally accepted medical treatment, to physically transition to the sex that does not correlate to the

22

person's sex-assigned-at-birth but does correlate to the person's gender identity.[26] We do not rule out that there may be other medically equivalent evidence that we are not yet aware of; this case does not raise that issue. There is no requirement, however, for proof of surgery or of the "permanent and irreversible" physical change that was the judicial equivalent to the surgery requirement that once existed in an administrative proceeding. As the *Fiscal and Policy Note* to SB 743 made clear, present understanding is that the seriousness of and commitment to a request to a court to declare gender, gender identity, or gender marker is not necessarily tied to the irreversibility of the medical treatments undertaken to effectuate a physical change from sex-assigned-at-birth.

At present, the Maryland Judiciary's form petition for name change for an adult includes a space in which the petitioner also may request "that my gender/sex be changed from _____ to _____ for the purposes of updating my sex designation (gender marker) on my birth certificate and other identity documents." *See* Judiciary Form CC-DR-060 (Rev. 03/12/2021).[27] That form advises the petitioner to "[a]ttach documentation from a

---

[26] Again, we emphasize that we are dealing only with transgender individuals in this case and not with people who identify as non-binary.

[27] The form also correctly states that "[a] court order is not necessary to update your gender marker on records with the Social Security Administration, Maryland Motor Vehicle Administration, Maryland Division of Vital Records (for your birth certificate), or the U.S. Department of State (for your passport)." Judiciary Form CC-DR-060. Since October 1, 2019, Md. Code (Repl. Vol. 2020), § 12-305(a) of the Transportation Article ("TA"), has allowed an applicant for a driver's license, identification card, or moped operator's permit to indicate a gender of female, male, or "[u]nspecified or other," the latter of which shall be displayed as an "X" in the location for gender. That statute further prohibits the Maryland State Department of Transportation from requiring such an applicant to provide proof of sex and from denying an application because the sex selected

(continued)

23

licensed health care practitioner showing you have undergone treatment appropriate for gender transition or have been diagnosed with an intersex condition[,]" and cites H-G section 4-211(b)(2)(i). The Judiciary's form for change of name for a minor does not include a space for such a request.[28]

### *Pertinent Rights of Parents in CINA Cases*

"The liberty interest of parents to raise their children as they see fit without undue interference by the State is a fundamental right under the Fourteenth Amendment of the United States Constitution." *In re O.P.*, 470 Md. 225, 234 (2020) (citation omitted). *See also In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 495 (2007) (Parents have a fundamental constitutional right to raise their children "free from undue and unwarranted interference on the part of the State[.]") (citations omitted). "Under the doctrine of *parens patriae*, the State has an interest, and a responsibility, to protect the health, safety, and welfare of children." *In re O.P.*, 470 Md. at 234. *See also In re Yve S.*, 373 Md. 551, 569 (2003) (citation omitted).

When a child is alleged to have been abused or neglected, the parents' fundamental rights in the child and the State's interest in protecting the child come into conflict. *See In re Adoption/Guardianship of H.W.*, 460 Md. 201, 205 (2018) (there is a "delicate balance"

---

by the applicant does not match the sex indicated on another of the applicant's documents. TA § 12-305(c).

[28] We repeat that the terminology used for a request relating to gender that is different from sex-assigned-at-birth should not be for a "change" in gender, gender identity, or gender marker, but for a declaration of gender, gender identity, or gender marker.

between parents' constitutional right to raise their children and the State's interest in protecting the safety and welfare of children). In a CINA case, the best interest of the child standard applies and "trumps all other considerations" when the fundamental interests of parents in raising a child are weighed against the State's important duty to protect the child from being abused or neglected. *In re Adoption of Ta'Niya C.*, 417 Md. 90, 111 (2010) (citation and footnote omitted).

The CINA statutory scheme accommodates the competing interests between the State in protecting a child who is alleged to have been neglected or abused and the child's parent who has a fundamental interest in raising that child. The parent does not lose his or her fundamental rights but, when a child is adjudicated to be a CINA, the court may determine a disposition that protects the child. For instance, as in this case, the court may "[g]rant limited guardianship to the department or an individual or both for specific purposes including medical and educational purposes or for other appropriate services if a parent is unavailable, unwilling, or unable to consent to services that are in the best interest of the child[.]" CJP § 3-819(c)(1)(ii).

At present, K.L.'s permanency plan of APPLA is a "permanent child placement" under CJP section 3-823(e)(1)(i)(5), which is a type of "out-of-home placement" for children 16 or older. The living arrangement "[a]ddresses the individualized needs of the child, including the child's educational plan, emotional stability, physical placement, and socialization needs; and [i]ncludes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life[.]" CJP § 3-823(e)(1)(i)(5). Overseen by the Maryland Department of Health and Mental Hygiene, the

25

placement is designed to "[c]oncurrently develop and implement a plan in the best interests of the child to facilitate a planned, permanent living arrangement for the child who cannot be reunified." Code of Maryland Regulations ("COMAR") 07.02.11.01C. With respect to parental rights, the regulations governing the APPLA permanency plan provide:

> Consistent with the best interest of the child, the parents . . . of a child in out-of-home placement may: . . . [p]articipate in decisions about major changes in the life of the child, unless those changes are matters protected by the child's privacy rights or contrary to the child's best interest.

COMAR 07.02.11.07C(8).

## II.

### MOTION TO DISMISS

The right to appeal in this State is determined by statute and thus must be "legislatively permitted." *In re C.E.*, 456 Md. 209, 220 (2017) (citations omitted). Generally, appeals may be taken only from "a final judgment entered in a civil or criminal case by a circuit court." CJP § 12-301. This requirement, commonly referred to as "the final judgment rule," "aims to promote judicial economy and efficiency by preventing piecemeal appeals after every order or decision by a trial court." *In re C.E.*, 456 Md. at 221 (quotation marks and citation omitted).

In *In re D.M.*, 250 Md. App. 541, 555 (2021), Judge Arthur explained what a final judgment is.

> To qualify as a final judgment, an order must be so final as either to determine *and conclude* the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding. In other words, the order must be a complete adjudication of the matter in controversy, except as to collateral

26

matters, meaning that there is nothing more to be done to effectuate the court's disposition.

(Quotation marks and citations omitted). The final judgment rule has three exceptions, however. They are:

> (1) appeals from interlocutory orders specifically allowed by statute [predominately orders enumerated in CJP § 12-303]; (2) immediate appeals permitted when a circuit court enters final judgment under Maryland Rule 2-602(b); and (3) appeals from interlocutory rulings allowed under the common law collateral order doctrine.

*In re O.P.*, 470 Md. at 250 (citation and footnote omitted).

In moving to dismiss this appeal, the Department, joined by K.L., argues that the December 16, 2020 Order is not a final judgment and that none of the exceptions to the final judgment rule apply. Mother agrees that the December 16, 2020 Order is not a final judgment but takes the position that it is appealable under CJP section 12-303(3)(x). That statutory exception to the final judgment rule permits a party to take an appeal from an interlocutory order "[d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order[.]" Mother also maintains that the December 16, 2020 Order is appealable under the collateral order doctrine.

The parties are correct that the December 16, 2020 Order is not a final judgment. K.L.'s CINA case remains open and ongoing and the order does not conclude the matter and resolve all the issues in controversy. If the December 16, 2020 Order is appealable, it must be so under either CJP section 12-303(3)(x) or the collateral order doctrine.[29]

---

[29] Rule 2-602(b), governing a court's written order directing the entry of a final judgment where the judgment did not dispose of the entire claim, has no application here.

27

Many times over the past twenty years, the Court of Appeals has examined whether various interlocutory orders in CINA cases are appealable under CJP section 12-303(3)(x). *See In re Damon M.*, 362 Md. 429, 438 (2001) (order changing permanency plan from reunification to adoption, long-term care, or permanent foster care was immediately appealable); *In re Samone H.*, 385 Md. 282, 315-16 (2005) (order denying mother's motion for an independent bonding study was not immediately appealable because it did not deprive her of care and custody of her children or change the terms of the prior order to her detriment); *In re Billy W.*, 387 Md. 405, 426 (2005) (orders eliminating parent's unsupervised visitation with children and requiring parent to secure services of off-duty police officer to supervise visits were changes to the parent's detriment and thus were immediately appealable); *In re Karl H.*, 394 Md. 402, 404-05 (2006) (order changing permanency plan from reunification to reunification and adoption was immediately appealable); *In re Joseph N.*, 407 Md. 278, 292 (2009) (order effectively broadening permanency plan to parent's detriment by "expand[ing] the universe of persons eligible for reunification" was immediately appealable); *In re C.E.*, 456 Md. 209, 210-11 (2017) (order waiving Department's obligation to make reasonable efforts to unify was not immediately appealable as it did not change permanency plan or deprive mother of care and custody of child). *See also In re Katerine L.*, 220 Md. App. 426, 443 (2014) (order denying father's motion for genetic testing in CINA case did not fall within CJP section 12-303(3)(x)); *In re D.M.*, 250 Md. App. at 558-59 (order amending permanency plan of reunification with parent to add concurrent plan of placement with a relative for custody and guardianship

28

was immediately appealable as it had the potential to deprive a parent of care and custody of child).

In re Karl H., *supra*, and *In re Joseph*, *supra*, illustrate the reasoning the Court of Appeals has employed to decide whether an order in a CINA case is appealable under CJP section 12-303(3)(x). In *In re Karl H.*, the Court explained that in deciding whether an order changing the CINA's permanency plan from reunification with the mother to reunification and adoption is immediately appealable,

> the focus should be on whether the order and the extent to which that order changes the antecedent custody order. . . . If the change *could deprive a parent of the fundamental right to care and custody of his or her child, whether immediately or in the future*, the order is an appealable interlocutory order.

394 Md. at 430 (emphasis added). Because the order in question had "the potential both to accelerate the termination [of] and to terminate a parent's custodial rights . . . adversely affect[ing] a parent's rights to care and custody" of her child, it was "sufficiently far enough along the continuum of depriving a parent of a fundamental right" to make it immediately appealable under CJP section 12-303(3)(x). *Id*. at 431, 430.

Similarly, in *In re Joseph N.*, *supra*, the Court framed the question of appealability under CJP section 12-303(3)(x) as whether the interlocutory order reaffirming a permanency plan of reunification with the child's mother but shifting the child's physical custody from the local department to his father, had or would effectuate a "detrimental change" to the mother's custody rights. 407 Md. at 291. Recognizing that the order "had the potential to facilitate and accelerate a grant of full custody to" father and was potentially "outcome-determinative" due to the "bonding and attachment that could take place"

29

between the child and his father while the child was in father's custody, the Court concluded that the order was immediately appealable. *Id*. at 292, 294.

In all the cases cited above, whether the parent would be deprived of "care and custody" of the child primarily concerned the present and potential future effect of the order appealed from on the parent's physical custody of the child. Recently, in *In re K.Y-B*, 242 Md. App. 473 (2019), this Court denied a motion to dismiss an appeal from an interlocutory order in a CINA case where the only appealable issue did not concern physical custody. In that case, the child was put in shelter care when still an infant. The mother refused to consent to the administration of routine childhood vaccinations, citing religious reasons. The juvenile court entered an order extending the duration of the original shelter care order and expanding the local department's limited guardianship by granting it authority to consent to vaccination of the child. The mother noted an appeal, and during its pendency consented to the continuation of shelter care for the child, thereby waiving her right to challenge that aspect of the juvenile court's order. The only issue not waived, and therefore properly before us, was the ruling on consent to vaccinations. We concluded that the order had "changed the terms of custody to Mother's detriment by authorizing the Department to consent to vaccinations over Mother's objection," depriving her of the care and custody of her child. *Id*. at 486 n.5. Accordingly, the order was appealable under CJP section 12-303(3)(x).

We return to the case at bar. As Mother acknowledges, the December 16, 2020 Order does not operate directly or indirectly to deprive her of physical custody of K.L., now or in the future. Mother asserts that the order deprives her of "legal custody,"

30

however, in that it negates her right to make an important decision affecting K.L.'s life. Legal custody, which together with physical custody comprise the entire concept of custody in family law cases, "carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare." *McCarty v. McCarty*, 147 Md. App. 268, 271 (2002) (citation and emphasis omitted).

K.L. counters that the definition of "custody" in CJP section 3-801(k) does not encompass legal custody as that concept exists under Maryland family law principles.[30] Further, she asserts that although Mother maintains her parental rights to participate in important decision-making regarding her life, Mother was given the opportunity to do so by participating in the hearing on the motion to expand limited guardianship.

The Department, focusing entirely on physical custody, maintains that the December 16, 2020 Order "has no effect on [Mother's] custodial rights" as she has not had physical custody of K.L. for many years and did not oppose implementation of K.L.'s APPLA permanency plan, which is designed to ease her into independence rather than to reunify her with Mother. In the Department's view, the order "merely authorizes consent for a reversible act . . . that does not materially diminish or impact [Mother's] custody of K.L."

---

[30] CJP section 3-801(k) defines "custody" as "mean[ing] the right and obligation, unless otherwise determined by the court, to provide ordinary care for a child and determine placement."

Whether custody of a child is disputed as between the child's parents or as between the State and a child's parent (or parents), the concept of "custody" rests in the first instance on the parents' fundamental constitutional right to raise their child. *In re Billy W.*, 386 Md. 675, 683-84 (2005) (citations omitted) ("[A] parent's interest in raising a child is a fundamental right, recognized by the United States Supreme Court as well as [the Court of Appeals]."). That fundamental parental right includes the right to decide where and with whom the child will live (physical custody) *and* to make a myriad of other important decisions affecting the child's life (legal custody). As we have explained, when a child has been found to be a CINA, the parents do not lose their fundamental rights in their child, but their rights must be balanced against the State's interest in protecting the child from abuse and neglect.

The definition of "custody" K.L. cites does not support her position, as it does not limit custody in a CINA case to physical custody. "[T]he right and obligation . . . to provide ordinary care for a child and determine placement" of CJP section 3-801(k) is verbiage broad enough to encompass both physical and legal custody. And, as our discussion above makes clear, up until the point that parents' rights in their child are terminated legally, the CINA statute and regulations protect their entitlement to make important decisions about their child. Moreover, *In re K.Y-B* stands for the proposition that an order depriving a parent of the "care and custody of his child" in a way that does not affect physical custody nevertheless is appealable under CJP section 12-303(3)(x). "Care and custody" encompass all fundamental parental rights, including, as we have held, the right to decide whether a child will be vaccinated – an issue unrelated to the child's physical custody. Therefore, an

32

interlocutory order depriving a parent of an important decision-making right with respect to the parent's child can be appealable under CJP section 12-303(3)(x).[31]

The right of parents to name their child is basic. Except for some children with intersex conditions, a child's biological sex is immediately identifiable at birth, visually, and because name and gender are closely associated, usually is a critical factor in the parents' choice of the child's first name. A child's sex-assigned-at-birth and first name both are central, defining characteristics about them, as they are about any person; and the child's developed gender identity becomes so. The parties to this appeal agree that parents' fundamental rights include not only the right to name their children but also the corresponding right to exercise the power of consent over their children's changing their names or having their gender identities declared.

Although a petition to change name for a minor child can be filed by a guardian or "other like fiduciary" or next friend, the child's parent has primacy in filing, under Rule 2-202(b), as the natural guardian who occupies that role automatically, without appointment. Likewise, to maintain consistency between who may request a change in name and gender marker on a minor's birth certificate and who may bring a court action to change a minor's name and declare a minor's gender identity, a child's parent must have primacy in filing

---

[31] We find no merit in K.L.'s argument that the December 16, 2020 Order is not appealable because Mother only was entitled to participate in the juvenile court's decision whether to grant the Department the authority to consent to the filing of a petition to change name and gender marker for K.L. The fact that Mother had the right to participate by making her position known, and that she did so, does not mean that she has no right to appeal the court's decision, either now, if the order is appealable, or at the conclusion of the CINA case.

such an action. Thus, ordinarily, Mother would have the right to consent (or withhold consent) to K.L.'s changing her name and declaring a gender identity other than her sex-assigned-at-birth and the right to file (or decide not to file) a petition to accomplish that.

In sum, like parents' rights to consent to childhood vaccinations, the rights of parents to consent to a legal course of action that could result in their child's name being changed and a new declaration of gender marker is fundamental to raising their children. The December 16, 2020 Order deprived Mother of that right. To be sure, when a petition to change name is filed on K.L.'s behalf, Mother will receive notice and will have the opportunity to object. Her right to consent to this course of action for K.L. was lost, however, which means the order is appealable under CJP section 12-303(3)(x).[32]

## III.

### THE JUVENILE COURT DID NOT ERR BY GRANTING THE DEPARTMENT SOLE AUTHORITY TO CONSENT TO FILING A PETITION TO CHANGE NAME AND GENDER MARKER ON K.L.'S BEHALF

Mother contends the juvenile court erred by granting the Department "sole and full authority" to consent to K.L.'s filing, through counsel, a petition for change of name and gender marker. She offers two reasons in support. First, the court should have applied the "extreme circumstances" standard, instead of only the best interest of the child standard, in making its decision. Second, because the evidence before the juvenile court consisted

---

[32] As noted, Mother also argues that the December 16, 2020 Order is appealable under the collateral order doctrine. We do not need to reach this issue and therefore we do not.

34

merely of competing proffers, it was legally insufficient to support the court's decision in K.L.'s favor, regardless of the standard applied.

We apply a three-pronged standard of review in CINA cases. We review factual findings for clear error under Rule 8-131(c); we review issues of law *de novo* and determine whether further proceedings are required; and we review the juvenile court's final decision for abuse of discretion. *In re Adoption/Guardianship of H.W.*, 460 Md. at 214 (citations omitted). *See also In re Yve S.*, 373 Md. at 586. A court abuses its discretion when "no reasonable person would take the view adopted by the trial court or when the court acts without reference to any guiding rules or principles." *Santo v. Santo*, 448 Md. 620, 625-26 (2016) (quotation marks, citation, and bracket omitted).

At the outset of our discussion, we must focus on precisely what decision we are reviewing. The parties' briefs devote much of their legal arguments to appeals in cases where lower courts ruled on whether to grant a petition to change a child's name. Here, no such decision was made, nor could it have been made by the juvenile court. *See In re Adoption/Guardianship No. 3155*, 103 Md. App. at 309-10. Rather, the juvenile court made what amounts to a preliminary decision — that the Department, not Mother, shall have the right to consent to the filing of a petition to change K.L.'s name and gender marker. That is the decision we are reviewing. Once a petition is filed in the circuit court, that court will make the decision whether to grant the change in name and gender marker.[33]

---

[33] As we have noted, in the Judiciary's form Petition for Change of Name (Adult), there is a space for the petitioner to request a change in gender marker as well; but the form Petition for Change of Name (Minor) does not include such a space. There is no reason

(continued)

35

Nevertheless, Maryland law on name and gender marker changes furnishes some perspective about the juvenile court's decision. No matter the standard and measure of proof applicable to the preliminary issue of consent to the filing of a petition for change in name and declaration of gender identity, the factors that will come into play, if and when a petition were to be filed, have a bearing on whether it is in K.L.'s best interest for consent to be given, and therefore whether it matters who holds the power to consent for her. Likewise, cases from other jurisdictions that, unlike Maryland, have addressed standards governing name changes for transgender children can provide guidance.[34] Our research has uncovered only two such cases. In both, name change petitions were filed on the child's behalf by a supportive parent.

*Sacklow v. Betts*, 163 A.3d 367 (N.J. Super. Ct. Ch. Div. 2017), an opinion by a New Jersey chancery court, is most helpful. In that case, the mother of a 16-year-old transgender male filed a petition on his behalf to change his first name to Trevor. *Id.* at 368-69. The child's parents had divorced, and the father opposed the petition. The court held a hearing at which mother, father, and child testified. The evidence showed that during puberty, the child, who the mother always had thought was a "tomboy," experienced a drastic downward change in behavior; that he received counseling and psychological

---

why a request for the court to make a declaration of gender, gender identity, or gender marker cannot be added to that petition as well, however. The circuit court has jurisdiction to decide both requested (and related) issues. It is sensible for the decisions to be made together.

[34] *See Circumstances Justifying Grant or Denial of Petition to Change Transsexual or Transgender Individual's Name*, 39 A.L.R. 7th Art. 9, Part III (Child Petitioners) (2018).

36

treatment and was diagnosed with gender dysphoria; that with his parents' consent, he started taking puberty blockers and had begun testosterone treatment in 2016; and that he had used the first name Trevor for five years. The father, who was *pro se* and cross-examined the child himself, indicated he was inclined to consent to the name change. Because it was not clear that he was consenting, however, the court approached the case as if he were not.

After finding that the best interests of the child standard applied, the court determined that the following factors should be considered in deciding whether a change of first name is in the best interest of a transgender child who wishes to have a name that aligns with the gender the child identifies with:

> (1) The age of the child; (2) The length of time the child has used the preferred name; (3) Any potential anxiety, embarrassment or discomfort that may result from the child having a name he or she believes does not match his or her outward appearance and gender identity; (4) The history of any medical or mental health counseling the child has received; (5) The name the child is known by in his or her family, school and community; (6) The child's preference and motivations for seeking the name change; (7) Whether both parents consent to the name change, and if consent is not given, the reason for withholding consent.

*Id*. at 369. The court evaluated the evidence on these factors and granted the petition.

In *Matter of H.C.W.*, 123 N.E.3d 1048 (Ohio Ct. App. 2019), a mother filed a petition to change first name on behalf of her 15-year-old transgender child, from his feminine birth name to a masculine name. The petition was accompanied by consents from both parents. At a hearing, the child testified that for many years he had sensed that he was a male, although his sex-assigned-at-birth was female, and beginning about a year prior he had started to use a masculine name and to present himself as male to his schoolmates. His

37

teachers referred to him by his chosen masculine name. The child's father testified that the child had been seeing a therapist and had been diagnosed with gender dysphoria. Both parents testified that the child was being treated by a doctor who recommended hormone therapy, which was to begin about a month after the hearing. They expressed belief that it was in their child's best interest for his first name to be changed from feminine to masculine. The court denied the request, finding that the child might be motivated by "short-term desires or beliefs" that could change and that he was not ready to make "this life-altering decision." *Id*. at 1051 (quotation marks omitted).

The Ohio Court of Appeals reversed, holding that the lower court had abused its discretion by denying the petition for name change. Explaining that the best interests of the child was the controlling standard, the court remarked that many factors that are relevant in disputes between parents over their children's surnames are not pertinent to whether it is in the best interest of a transgender child to change the child's first name to align with the child's gender identity. The court determined that the factors enumerated in *Sacklow* were pertinent and on the facts adduced in the court below, supported changing the child's first name.[35]

---

[35] In the one other name change case we found pertaining to a transgender child, also filed by the child's mother, the Missouri Court of Appeals held that the trial court had abused its discretion by ordering the child to undergo a mental health examination. *State v. Wagner*, 504 S.W.3d 899, 903 (Mo. Ct. App. 2016). Specifically, the court concluded that the child's mental health was not in controversy, as required by the Missouri rule governing mental health examinations.

### *The Extreme Circumstances Standard Did Not Apply*

Mother first argues that in deciding whether to grant the Department authority to consent to a petition for name and gender marker change on behalf of K.L., the juvenile court should have applied the "extreme circumstances" test, announced in *Dorsey v. Tarpley*, *supra*. This is the test the Court of Appeals held must be used when a parent is seeking to change the surname the parents gave the child at birth and that the child has been using. Mother's argument has no merit.[36]

As explained, it is well-established that when, in a CINA case, there is a conflict between a parent's constitutional right to raise the child and the State's interest in protecting the child's safety and welfare, the best interest of the child standard not only controls but also is of "transcendent importance." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 497 (quotation marks and citations omitted). *See also Yve S.*, 373 Md. at 569 ("[T]he State's interest in all custody, adoption, and visitation disputes is to protect the best interests of the child caught in the middle of the fight."). Indeed, the limited guardianship statute pursuant to which the juvenile court made its decision embodies the best interest standard. It authorizes the court to grant a local department a limited guardianship "for other appropriate services if a parent is unavailable, unwilling, or unable to consent to services *that are in the best interest of the child*[.]" CJP § 3-819(c)(1)(ii)

---

[36] This argument also is not preserved. At the hearings before the magistrate and the juvenile court on K.L.'s motion, counsel for Mother did not argue that the "extreme circumstances" standard should apply. Ordinarily, we would not address this issue because it was not argued below. *See* Md. Rule 8-131(a). Because there is a paucity of Maryland case law on issues having to do with changes of name and declarations of gender identity for transgender children, we exercise our discretion to address the issue.

(emphasis added). There are no CINA cases in which juvenile court decisions about the welfare of a child in the State's custody have been decided under an "extreme circumstances" standard.

*Dorsey v. Tarpley* has almost nothing in common with this case. There, after a child's unmarried parents named him and he had been known by that name for over two years, his father decided his surname should be changed to a hyphenation of both parents' surnames. His mother disagreed. Each parent had an equal fundamental constitutional right to raise the child, including the right to name him, which they already had exercised. The State was not a party. The Court of Appeals engrafted the "extreme circumstances" standard onto the best interests of the child standard for deciding what surname the child should have because the child had become known by the name his parents had given him, which created a presumption against changing his name.[37]

---

[37] In *Dorsey*, the Court of Appeals adopted the following "best interest" factors for name changes, originally formulated in *Schroeder v. Broadfoot*, 142 Md. App. 569, 588 (2002) (citations omitted):

> 1) the child's reasonable preference, if the child is of the age and maturity to express a meaningful preference; 2) the length of time the child has used any of the surnames being considered; 3) the effect that having one name or the other may have on the preservation and development of the child's mother-child and father-child relationships; 4) the identification of the child as a part of a family unit; 5) the embarrassment, difficulties, or harassment that may result from the child's use of a particular surname; 6) misconduct by one of the child's parents disparaging of that parent's surname; 7) failure of one of the child's parents to contribute to the child's support or to maintain contact with the child; and 8) the degree of community good will or respect associated with a particular surname.

381 Md. at 117 (citation omitted).

The *Dorsey* Court identified two paramount factors for deciding whether extreme circumstances existed to rebut that presumption. "First, the court is to consider any evidence of misconduct by a parent that could make the child's continued use of the parent's surname shameful or disgraceful." *Id.* at 115-16 (citation omitted). "Second, the court is to consider whether th[at] parent wilfully abandoned or surrendered his or her natural ties to the child." *Id.* at 116 (citation omitted). Thus, extreme circumstances are those strongly warranting a child's being separated from a surname made infamous by a parent's conduct or that implies the parent has been honoring the most basic parental functions for the child when he has not.

The case at bar is not a private dispute between two parents about whether their child's last name should be changed. It does not concern K.L.'s last name, which she made known she does not want to change. The dispute is over K.L.'s first name, which she wants to be consistent with her female gender identity. Her parents are not the two opposing parties. The opposing parties are the State, which has had custody of K.L. for nine years and supports, as positive for K.L.'s health and welfare, her desire to change her first name, and Mother, who lost custody of K.L. due to neglect, has not fully accepted K.L.'s gender identity, and will not consent to a court action to change K.L.'s first name and declare her gender marker. The purpose of the extreme circumstances test — to allow a change of a child's established last name when the parent with that name has disgraced it or has neglected the child — has no relevance here. The juvenile court was correct to apply the best interest of the child standard, without an added showing of "extreme circumstances," in ruling on K.L.'s motion.

41

### *The Evidence Was Legally Sufficient to Support the Juvenile Court's Ruling and the Court Did Not Abuse Its Discretion*

Mother's second argument calls into question the sufficiency of the evidence to support the juvenile court's ruling. Mother states, correctly, that as the moving party K.L. bore the burden of proving by a preponderance of the evidence that, at the least, it was in K.L.'s best interest to grant the Department authority to consent to the filing of a petition for change of name and declaration of gender marker on her behalf. She argues, however, that K.L. "failed to present any evidence in support of [her] motion," pointing out that K.L. did not testify or provide an affidavit and that the court's ruling rested on competing proffers, which is a legally insufficient basis to support it.

To be sure, we have twice held that juvenile courts erred by proceeding on competing proffers instead of receiving evidence. *See In re M.C.*, 245 Md. App. 215, 231-32 (2020), and *In re Damien F.*, 182 Md. App. 546, 583 (2008). Both times, we concluded that the juvenile court had abused its discretion in a CINA case by denying a request by a parent to present evidence relevant to disputes of material fact and instead ruling based on factually controverted proffers. That was not the circumstance here, however. At the outset of the December 7, 2020 exceptions hearing, counsel for the parties agreed that there were no facts in dispute and to proceed by presentation of argument for that reason. None of the parties called, or asked to call, witnesses. Counsel for the Department asked the court to hear Ms. Stephanos, K.L.'s social worker, and no one objected.

Moreover, the material facts were not in dispute. Counsel for the Department referenced Dr. Pine's testimony at the 2017 hearing about K.L.'s gender dysphoria

42

diagnosis; the use of puberty blockers and hormone medication to effectuate the gender transition process; and the impact that such treatment likely would have on K.L.'s comfort with her gender identity. Counsel also referred to Dr. Pine's 2017 testimony that medication reduces the risk that transgender people like K.L. will experience violence, bullying, and self-harm. She asked the court to take "judicial notice" of this prior testimony. Mother's counsel neither objected nor asked to present opposing evidence. Indeed, Mother did not appeal the juvenile court's 2017 order.

As noted, the Department's counsel further referenced the 2018 study titled, "Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior among Transgender Youth," *supra*, at n. 14, which emphasizes the positive impact that use of chosen names has on transgender youth. Mother's counsel did not object. Ms. Stephanos explained why it was difficult for K.L. to appear at a hearing at which her original name is used and she is referred to by masculine pronouns; that K.L.'s Identification Card identifies her as male and she is "outed" when she must use it in applying for jobs; that K.L. consistently has expressed the desire to change her first name to be feminine; and that K.L.'s mental health is adversely affected when she must use a masculine first name and is referred to with masculine pronouns.

Rather than object to any of this or seek to present countervailing evidence, Mother's counsel presented by way of argument (as agreed) reasons why the Department should not be given authority to consent to a petition for name change and declaration of gender marker for K.L.: that K.L. had not experienced violence so a name change was not necessary to protect her; that the study on use of chosen names was not specific to K.L.,

for the same reason; and that changing K.L.'s name would mean she would have a feminine name and male genitals, which itself could expose her to harm.

Unlike in *In re M.C.* and *In re Damien F.*, the juvenile court in this case did not proceed on competing proffers in the face of disputed material facts and a request to present evidence. There were no proffers; the material facts were not disputed; and the parties agreed to proceed on arguments only and did so.

The undisputed material facts before the juvenile court were that K.L., 16 years old at the time, had been diagnosed several years earlier with gender dysphoria and, under the supervision of a health care practitioner and with the support of her social worker, has been taking feminizing hormones and other accepted medications to transition to female physically. She perceives herself as female and, consistent with her gender identity, presents herself as a female. She is embarrassed and humiliated in situations where she has to use official identification with a masculine name, is called by her masculine given name from birth, or is referred to with masculine pronouns. She has been using a chosen feminine name and feminine pronouns and no longer identifies with her given name. She wants a feminine first name to match her gender identity and does not want to change her last name.

Although the juvenile court was deciding whether it advances K.L.'s best interests for the Department, instead of Mother, to have the sole authority to consent to the filing of a petition for name change and gender marker declaration for K.L., it is worth noting that the undisputed facts elicited in this case satisfy many of the factors the courts in *Sacklow* and *Matter of H.C.W.* held are central to a judicial decision whether to grant a transgender

44

minor's request to change first name. We agree with the observations of those courts that virtually all of the considerations relevant to whether it is in a child's best interest to undergo a change in surname are not material to whether a transgender child's first name should be changed to align with the child's gender identity. The best interest factors approved in *Dorsey v. Tarpley*, for example, focus on how changing a child's last name will affect the parent-child relationship. *Dorsey*, 381 Md. at 117 (effect of having one surname or another on mother-child and father-child relationships; identification of child as part of family unit based on last name; misconduct of parent disparaging surname; degree of good will or respect associated with particular surname; length of time child has used surname). These factors are important when parents are in a dispute over their child's last name, because a surname reflects association between the child and a parent or a family. They have no bearing on whether a child's first name should be changed because it is inconsistent with the child's gender identity.

In essence, the arguments Mother's counsel put forth were that K.L. had not experienced violence due to her transgender status, so publications advocating that it is protective for transgender people to change their given names do not apply to her, and that she might be the target of violence if she has a feminine first name but has not undergone gender confirmation surgery. There are several weaknesses in these arguments.

Fortunately, K.L. has not yet experienced violence, but that is no reason to discount the very real danger transgender children face when their status is "outed" by disclosure of given names that align with their sex-assigned-at-birth but not with their gender identity. *See In re Dustin T.*, 93 Md. App. 726, 735 (1992) (when assessing the risk of harm to a

45

child, a court need not wait until the child suffers actual injury to protect the child) (citation omitted). When the same argument was made in *Sacklow v. Betts*, the chancery court dismissed it:

> The fact that Trevor did not testify to a personal experience of violence or crime against him based on his gender identity does not negate the fact that such violence exists. On October 27, 2009, gender identity was included as a federal hate crime. "Recognizing that transgender people continue to be disproportionately targeted for bias motivated violence, the federal statute, known as the 'Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act' (Pub. L111-84 § 4701 et seq.), adds…gender identity…to the categories included in existing federal hate crimes law…" *Matter of E.P.L.*[,] 26 Misc.3d 336, 891 N.Y.S.2d 619, 621 (2009).

163 A.3d. at 374.

K.L. has been using a feminized version of her given name, as the common law allows her to do, which means that most of the time, to the outside world, her appearance and first name match. This may be protective for her. Her lawyer specified, however, that there are times when K.L. must use the official given name on her Identification Card, which is masculine, thereby disclosing, involuntarily, her transgender status and exposing herself to potential harm. There are many circumstances, for instance those involving workplaces, school, or health care, where K.L. will have to use her official identification or state her official given name and thus disclose that she is transgender. Without a court-ordered name change, that potential risk is continuing. While it is possible she could be subjected to violence if it becomes known to an unaccepting person that she is a transgender female who has not undergone gender confirmation surgery, that risk would seem low compared to the risk of being "outed" by required use of a masculine name outside the privacy of her home.

46

Likewise, with respect to an action to declare gender identity for K.L., the preliminary question, whether it is in K.L.'s best interest for Mother to retain her right to consent (which she has withheld) or for the Department to be granted the right to consent (which it supports giving), can be measured by assessing whether K.L. likely could prove to a court that it should grant the requested relief. As discussed, based on our understanding of the principle espoused in *In re Heilig*, in a declaration of gender identity action K.L. will need to adduce proof (or equivalent proof) that an expert health care practitioner has evaluated her; that that expert attests that K.L. has been receiving feminizing hormones and/or other medical treatment for the purpose of transitioning physically from male to female; and that in that expert's opinion, that treatment satisfies generally accepted medical standards and warrants a declaration of gender identity for K.L. that is not the same as her sex-assigned-at-birth. This proof will comport with the proof necessary to obtain a change in sex designation on a Maryland birth certificate.

The facts before the juvenile court in this case establish that K.L. will be able to present proof satisfactory for a court to declare that her gender identity is female even though her sex-assigned-at-birth was male. Dr. Pines evaluated her, diagnosed her with gender dysphoria, and, as of the date of the hearing, had been treating her with puberty blockers and feminizing hormones for three years.

When Mother addressed the court, she asserted that mental health problems being suffered by the public in general due to the pandemic weigh against K.L.'s being permitted to seek a name change and declaration of gender identity - - notwithstanding the undisputed fact that K.L.'s mental health is being harmed by her not having an official first name that

47

aligns with her gender identity. Mother demonstrated that she simply is not accepting of K.L.'s female gender identity, referring to her by the pronoun "he." The ultimate question for the court was whether the right to consent on behalf of K.L. should remain with Mother, who discounts K.L.'s female gender identity even though she has been transitioning to female for years, or with the Department, which has supported K.L.'s gender transition over the years, when it is likely that K.L. will be able to prove to a circuit court that her transgender status militates in favor of changing her gender identity to female and her first name to a feminine name that comports with that gender.

We consider the juvenile court's decision not only on those undisputed facts before it but also in light of the established record of K.L.'s nine years as a CINA, due to Mother's neglect, and Mother's history of refusing to consent to any medical treatment to address K.L.'s gender dysphoria. Given the total circumstances in this case, we conclude that the juvenile court's decision that it is in K.L.'s best interest for the Department to have sole authority to consent to the filing of an action to change K.L.'s name and to declare her gender identity was not in error and was well within the scope of its discretion.

> **ORDER OF THE CIRCUIT COURT FOR BALTIMORE COUNTY, SITTING AS THE JUVENILE COURT, AFFIRMED.**
>
> **COSTS TO BE PAID BY THE APPELLANT.**

48